**UNITED STATES of America,
Plaintiff,**

**v.**

**James Allen BARBER et al., Defendants.
Crim. A. No. 1926.**

United States District Court
D. Delaware.
Aug. 22, 1969.

F. L. Peter Stone, U. S. Atty., and Norman Levine, Asst. U. S. Atty., Wilmington, Del., for the United States.

L. Coleman Dorsey, Wilmington, Del., for defendant Steven Eric White.

Richard E. Poole, Wilmington, Del., for defendant Calvin Jerome Loper.

Louis L. Redding, Wilmington, Del., for defendant Manuel Brunswick.

Henry A. Wise, Jr., Wilmington, Del., for defendant William H. Robinson.

## OPINION

LATCHUM, District Judge.

This criminal action[1] was instituted by the United States against thirteen defendants charging them with identical violations of 18 U.S.C. §§ 111, 2, 372 and 752(a). These charges were brought as a consequence of an attack by a group of men against Special Agents of the Federal Bureau of Investigation, Frank W. Grant and James B. Snyder, after they had arrested Robert L. Barber as an Army deserter. The attack occurred at the intersection of Twenty-second and Pine Streets, Wilmington, Delaware on October 29, 1968, while the agents were taking their prisoner to their automobile.

Count 1 charged the defendants with violation of 18 U.S.C. § 111, in that they wilfully and by means of a dangerous weapon forcibly assaulted, opposed, impeded and interfered with Special Agent Grant, and also aided and abetted such acts, in violation of 18 U.S.C. § 2. Count 2 charged the defendants with similar acts against Special Agent Snyder, but did not charge the use of a dangerous weapon. Count 3 charged that the defendants conspired to prevent by force, intimidation and threats the two agents from discharging their official duties, in violation of 18 U.S.C. § 372. In the same count, it was charged that the defendants, in furtherance and as part of the conspiracy "by an overt act of force, intimidation and threats did prevent" the agents from retaining custody of Robert Lewis Barber, whom they had arrested and held in custody. Count 4 charged that the defendants "did rescue, and did instigate, aid and assist the escape of Robert Lewis Barber, who had been theretofore lawfully arrested and was being then and there held in lawful custody" by the agents, in violation of 18 U.S.C. § 752(a).

The jury returned guilty verdicts against eight of the defendants and acquitted three.[2] One of the thirteen defendants failed to appear for trial.[3] A directed verdict of acquittal was granted by the Court to David Smoke at the close of the government's case.

1. For prior proceedings in this case, see 296 F.Supp. 795 and 297 F.Supp. 917 (D.Del.1969).

2. The defendants who were found guilty of one or more counts were: James Allen Barber, Warren Hilman Mowbray, Robert Tate, Steven Eric White, Calvin Jerome Loper, Manuel Brunswick, Allan Steed and William H. Robinson. The defendants acquitted by the jury were: Roland Thomas Johnson, James Allen Staats and Robert Jefferson Bolden, Jr.

3. Defendant Nelson Hudson.

The jury found defendants Steven Eric White guilty of Counts 3 and 4; Calvin Jerome Loper guilty of Counts 1, 2, 3 and 4; Manuel Brunswick guilty of Counts 2 and 4; and William H. Robinson guilty of Counts 1, 2, 3, and 4. Each of these latter four defendants has now filed motions for judgment of acquittal and for a new trial.

The standards governing motions for acquittal and for a new trial on the grounds of insufficient evidence are stated in United States v. McGonigal, 214 F. Supp. 621, 622 (D.Del.1963):

> "The test applicable to a motion for judgment of acquittal is somewhat different from that applicable to a motion for a new trial. In the former, the Court scrutinizes the evidence including reasonable inferences to be drawn therefrom, from the point of view most favorable to the government and assumes the truth thereof. If there is substantial evidence justifying an inference of guilt, irrespective of the evidence adduced by the defendant, the Court must deny the motion. In the latter, where the ground is that the verdict is contrary to the weight of the evidence, the Court weighs the evidence of both sides, considers the credibility of the witnesses, and if the verdict is against the weight of the evidence a new trial must be granted."

Rule 33, Fed.R.Crim.P., provides generally that the court on motion of a defendant may grant a new trial to him if required "in the interest of justice."

### Defendant Steven Eric White

Defendant White asserts there was insufficient evidence that he conspired with others to prevent the agents from discharging their official duties or that he helped Barber to escape. The testimony of three witnesses—Agent Snyder, Deborah Price and T. Willey McCreedy—implicated White in the acts of conspiracy and of aiding the prisoner to escape. A review of this cumulative evidence indicates that there was sufficient evidence

for the jury to convict White on these counts.

Agent Snyder made what the Government asserts is an in-court identification of the defendant White as being in the group of males who blocked the agents' passage to their automobile. The actual words of Agent Snyder when making his purported in-court identification were that the defendant White appeared "very similar" to an individual whom he observed in the group, (Tr. 321),[4] and that White "resembles, strongly resembles someone who I observed in the group." (Tr. 322). Snyder said that his statement that White was very similar in appearance was based on White's stature, build and facial characteristics. (Tr. 382–383).

Deborah Price stated that she remembered that Steven White was in the fight. (Tr. 781). On direct examination, she testified that she remembered seeing a picture of White and realizing from the picture that he was at the scene of the attack. (Tr. 782–783). Deborah Price's testimony as to her contact with White before the attack, however, admittedly was contradictory. On direct examination, she said that although White was a friend of her older brother (Tr. 782) and although this brother told her a lot about him, the witness said that she had not actually seen White at her house and did not know him before the fight. (Tr. 781). On cross-examination, however, the witness testified that her brother had introduced her to Steven White. (Tr. 863). Further, at trial, in pointing out a person she identified as White, she actually pointed out the defendant Robinson.

The defendant White asserts that after Deborah Price's misidentification of Robinson as White, her testimony "no longer had probative value" and therefore, should have been stricken. This in-court misidentification, as well as her conflicting statements about her knowledge of White before the fight, however, go to the weight and not the admissi-

4. Tr. refers to the trial record transcript.

bility of her testimony. The value of Deborah Price's testimony with regard to White is not, as a matter of law, worthless. Her testimony was properly admitted. It was for the jury to evaluate her testimony, and give to it the weight which the jury felt appropriate. It was not error, therefore, to refuse to strike the testimony of Deborah Price because of her in-court misidentification.

Witness Twilley McCreedy testified that he saw White running from the scene and also made an in-court identification (Tr. 1048–1050). He then stated that the person he saw running by resembled White but he was not presently sure it was White. (Tr. 1103). He later said on cross-examination that he does not have a photographic memory of someone he has seen, but he thought it was White who was running by his truck. (Tr. 1111). McCreedy also had identified White at a lineup. McCreedy had stated on cross-examination that he had not picked the defendant White out of a lineup, but after refreshing his recollection, testified that he had identified White in a lineup. (Tr. 1119–1120).

White asserts that the testimony of the witnesses Price and McCreedy is insufficient to establish beyond a reasonable doubt that White conspired with others or helped Barber escape.

■ White argues, and the Government agrees, that more than a mere resemblance is necessary for identification testimony in order to take the question of identification to the jury and to establish guilt by reason of that identification beyond a reasonable doubt. Here, however, we have more than testimony of a mere resemblance. Twilley McCreedy testified directly that he saw White run from the scene. Although he later expressed a certain lack of certainty that it was White, he did say he thought it was White. Such a lack of positiveness in identification does not destroy the value of the identification, but goes to the weight of the testimony. Agent Snyder's testimony was not testimony of a mere resemblance. He testified that White

*strongly resembled* a man in the group based on his stature, build and facial characteristics. Deborah Price's testimony placing White in the affray could also be considered by the jury for what it was worth.

■ A review of the evidence shows that the jury's verdict was not against the weight of the evidence.

■ White also urges that he was prejudiced by an allegedly unfair comment made by the prosecuting attorney during summation. The prosecutor stated: "Counsel questioned the manner in which the witness McCreedy made the in-court identification of White," and then read to the jury from page 1049 of the trial transcript the portion of McCreedy's testimony where he positively identified White. (Tr. 2377). White states that the prosecutor was trying to show that White's counsel was attempting to mislead the jury. This argument lacks merit. White's counsel in effect did question McCreedy's manner or way of making his in-court identification of White. He reviewed McCreedy's testimony, where he had been, what he had been doing and the circumstances under which he identified or was able to identify White. (Tr. 2232–2233). For example, counsel for White said, "So it is unlikely that he [McCreedy] was really paying close attention to the people who were running down the street." (Tr. 2233).

■ White has also moved for a new trial on the basis of newly-discovered evidence. White's motion seems to be a direct result of a similar motion made by defendant Brunswick, to be dealt with below. Brunswick has produced affidavits of James Allen Barber and Warren Mowbray, co-defendants with Brunswick and White, stating that they had been at the scene, did not see Brunswick and would have seen him had he been there. White, however, has not submitted affidavits of James Allen Barber and Warren Mowbray stating that they did not see White at the scene. The motion states "on information and belief" James Allen Barber and Warren Mow-

bray were present at the scene of the crime, but did not see White at the scene. Even if such evidence exists, it is not grounds for a new trial since it is merely cumulative and not likely to produce an acquittal or a new trial. (See the discussion of Brunswick's motion, *infra*).

*Defendant Calvin Jerome Loper*

Defendant Loper argues that there is a complete lack of credible testimony that he was actually involved in any of the fighting. The only credible evidence against him, he argues, at best proves his mere presence at the scene of the incident, an insufficient basis upon which to base a conviction of aiding and abetting or participating in the commission of a crime.

■ The evidence as to the identity of Loper was proper, admissible and sufficient to sustain the verdict. There is evidence that Loper was involved in the fighting itself. Deborah Price stated that from her porch she saw two men being beaten. Among those fighting was Loper. (Tr. 764–765, 892, 916). She had seen Loper before, sometimes at the Barber house. (Tr. 766–767, 890). On cross-examination she identified a photograph of Bootsie Burton (defendant Robinson's Exhibit No. 1), as Calvin Loper. (Tr. 790, 792–793). On redirect, she reiterated that she had seen Loper "every once in a while" before the fight (Tr. 890–891) and that she remembers the faces of the men she had already identified, and she identified Loper as one of the men holding an agent against a car. (Tr. 892). Prior to that time she testified that Mowbray, Barber and Brunswick were holding the agent. (Tr. 768). On recross, she stated that the men holding Agent Snyder against the car were Brunswick, Barber and Loper, and not Brunswick, Barber and Mowbray. (Tr. 916).

The weight to be accorded to Deborah Price's testimony was a matter for the jury. Any contradictions or modifications of direct testimony does not establish as a matter of law that the testimony should be disregarded by the jurors

or that the Government should be required to stipulate to that effect, as Loper has urged.

Other evidence contributes to the sufficiency of the evidence against Loper. Agent Snyder identified Loper in the courtroom as one of the men who stopped him immediately before the attack. Agent Snyder testified that he had examined several photographs in the hospital after the attack and that he had then described a photograph of Loper as that of a person who "looked to me to be one of the individuals who was in the group" which had attacked him and Agent Grant. (Tr. 335–336).

Carol Jean Wright testified that she had known defendant Loper "for a long time" (Tr. 1197) and that she recognized Loper in the group of men attacking the agents. (Tr. 1196). On cross examination, she stated that she thought her husband knew Loper, but that in any case she knew Loper—"I know him [Loper] just by seeing him I know him." (Tr. 1219). Her husband, Robert Wright, stated that he did not know Loper and never introduced his wife to Loper. (Tr. 1576–77, 1580). It should be noted that Mrs. Wright never said with certainty that she had met Loper through her husband, but remained positive that she had known Loper previously. (Tr. 1197).

Ernestine Barber recognized Loper from a photograph (GX 12; Tr. 477). She had seen him walking the streets before the day of the assault (Tr. 480) and saw him in the group of individuals who participated in the assault. (Tr. 478).

The Court, after a review of the evidence, does not find that the verdict was against the weight of the evidence.

■ The Court also finds that its denial of Loper's motion for an instruction to disregard the testimony of Catherine Butler Wright in the case against him does not constitute grounds for a new trial. The testimony of Catherine Butler Wright was relevant and proper evidence for the jury to consider. Counsel cross-examined the witness (Tr. 652–

655) and also was permitted to introduce affirmative evidence regarding her testimony.[5] (Tr. 1748, 1783). The statement of counsel for the Government at side bar that he agreed with counsel for Loper "that Catherine Butler Wright did not identify the defendant Loper," (Tr. 2040), was not an admission or concession intended to reach beyond the specific stipulation entered into by the government and counsel for defendant. (See fn. 4). This sidebar statement of the Government therefore has no effect on the admissibility of Catherine Butler Wright's testimony. The Government refused to stipulate that her testimony against Loper should be stricken. (Tr. 1747–48).

Because some of the witnesses who testified identified defendants other than Loper without at the same time remembering Loper's presence at the scene does not mean that Loper was not in fact present. The opportunities for observation in a confused atmosphere, which existed in this case, are limited, with the result that any one witness may not be able to recognize all of the participants.

■■■ That Snyder, Ernestine Barber, and Carol Jean Wright did not mention that the person they saw had a droopy artificial eye, although a police photographer described Loper as having a right eye which "sort of like droops" (Tr. 408), does not as a matter of law make insufficient the evidence against the defendant Loper. Similarly, the jury's acquittal of Robert Bolden, whom Agent Snyder identified in the line-up as one of the participants, or the jury's acquittal of Roland Johnson, who Agent Snyder testified resembled one of the participants, does not destroy the credibility of Agent Snyder's testimony or

render insufficient the cumulative testimony against defendant Loper.

■■■ Loper further urges that the failure to allow him to introduce certain evidence as to the circumstances surrounding the witnesses' identifications of him deprived him of a fair trial. Loper asserts that the display of a photograph singly as in the case of Ernestine Barber or a small group of photographs, as in the case of Agent Snyder and Carol Wright is undesirable, if not improper, and should be a matter for the jury's consideration in assessing the weight to be accorded to the identification testimony.

The failure to allow Loper to introduce into evidence the photographs used in out-of-court identification procedures is not grounds for a new trial. The Court weighed the slight probative value which the photographs might have for the defendant Loper against the possible prejudice to co-defendants, and determined not to admit them as evidence.[6] (Tr. 1783–1784).

Loper also reasserts his pretrial argument against the holding of a joint trial. The issues he raises already have been determined adversely to him in United States v. Barber, et al., 296 F. Supp. 795 (D.Del.1969) and need not be repeated here.

■■■ Loper also contends that statements made by the attorney for Robert Bolden during summation were highly prejudicial. Counsel for Bolden in summation noted that all the defendants were black and that the agents were white, and that the jury should guard against unconscious prejudice. He noted that there have been other incidents similar to the one out of which this trial arose. He further stated that "In

---

5. By stipulation between the government and counsel for the defendant Loper, the Court instructed the jury: First, "that Calvin Loper did not participate in any lineup conducted in connection with this case" and second "That on November 6, 1968, Catherine Butler Wright viewed a group of photographs, one of which was Calvin Loper, and that she did not pick

Calvin Loper's photograph as that of someone she saw at 22nd and Pine Streets on October 29, 1968." (Tr. 1792).

6. Photographs which Loper asked to be admitted show Bureau of Police numbers on the photographs of some of the co-defendants.

their efforts, and I think legitimate efforts, of the black people to obtain what they have been denied and what they are entitled to, which is equal justice, there have been a few who in their hurry have not been able to restrain themselves and follow the law." (Tr. 2308–2309). At this point the Court interrupted the argument, and, at side bar, told counsel for Bolden that he was "injecting something into the case that [the Court] * * * and everybody else has tried to keep out. If you are going to dwell on this to any extent, then I think you should stop it," and stated that it felt that the argument was prejudicial to the other defendants. (Tr. 2309–2310). Counsel for Bolden made no further remarks of this nature in his summation.

The Court does not find that these remarks of counsel for co-defendant Bolden were such as to support a motion for severance or a new trial on the part of Loper. It was obvious to the jury that the defendants were black and the agents were white. The remarks of Bolden's counsel were designed to eliminate prejudice from the decision of the jury, not to produce it. Bolden's remarks were an effort to warn the jury to decide the case on the basis of the facts and not because of the race of the defendants. The Court made every possible effort to keep racial matters out of the trial in order to avoid any possible prejudice to the defendants. The Court, however, does not find that the remarks of Bolden's counsel, considering the manner and context in which they were spoken, were such as to call for a new trial in the interest of justice.

### Defendant William H. Robinson

■ Defendant Robinson objects to the pretrial order of the Court which provided *inter alia* that counsel had to sit next to his client and that such seating arrangement would remain unchanged during a morning or afternoon session. Objection was taken to this on the ground that it would thereby permit a witness to know in advance where each defendant was and who each defendant was, and would therefore make it possible to identify a defendant by location rather than by recognition. Robinson argues that such an arrangement leads to "induced identification."

The seating arrangement of the numerous defendants and their counsel was well within the discretion of the Court to provide for the orderly conduct of the trial. First, it should be pointed out the trial was a lengthy and complex one, involving 12 defendants and 13 attorneys. The defendants were to be seated within the bar of the court; more than 100 spectators were in attendance at the daily sessions of the trial, which lasted for 14 days. Proper security under these circumstances was an important concern of the court. Further, it should be noted that all counsel had the ethical obligations not to affirmatively mislead the jury.

Although the court had no reason before trial to expect any deviation from this standard by counsel, the court wished to avoid any situation in which this obligation would be unintentionally violated by counsel, or the jury otherwise mislead by circumstances beyond the control of counsel.

In addition, affirmative steps were taken to assure that this seating arrangement, necessary for the orderly conduct of the trial, did not lead to induced identification. All witnesses were sequestered, and therefore had no opportunity to identify any defendant with his counsel during the testimony of another witness.

Furthermore, there is little support for the allegation that the seating arrangement produced "induced identification." One example which Robinson offers to substantiate his allegations of induced identification through proximity of counsel and client does not tend to prove this allegation. (Tr. 1051–52). Witness McCreedy remembered Robinson was kicking an agent at the scene (Tr. 1051–1052) and had seen Robinson on the streets before. (Tr. 1053). McCreedy picked out Robinson in the courtroom. There is no evidence that McCreedy

knew who Robinson's lawyer was. Moreover, Robinson and his counsel did not sit in the same position throughout the trial.

At oral argument on the present motions, counsel for Robinson stated that he wanted to make it understood that he was making no suggestion that the District Attorney's office tampered with any witness. His only argument was that the witnesses could have been informed by someone other than the personnel of the District Attorney's office of the location of defendants. This unsupported allegation is not grounds for a new trial.

■ The Court also concludes that it was within its discretion, for the sake of clarity in the trial record, to have each counsel announce his name and the name of the person he represented. Robinson states that this procedure made it a very simple matter for any witness to make an identification of the defendant sitting next to his counsel after the counsel had identified himself. The defendant has failed to produce any evidence that such was the effect of the seating arrangement required by the Court, and the Court does not find that the seating arrangement made possible such induced identification.

■ Nor does the Court find that the fact that Agent Snyder was unable to identify Robinson as one of the persons present at the scene until he had looked at the photographs three times, but later came into court and made a positive identification of Robinson, can support the allegation of Robinson of induced identification in any substantial fashion.

Robinson next alleges that the Court erred in denying his motion for a judgment of acquittal. The record shows, however, that there was enough evidence upon which a jury could find guilt beyond a reasonable doubt. Agent Snyder testified that he was grabbed in a stranglehold from behind but did not know who did this. (Tr. 324). He then remembered being in the center of Twen-

ty-second Street and his glasses were knocked from his face by the person who had him in the stranglehold from behind. He then remembered being all the way across Twenty-second Street on the sidewalk by the white wall of a barber shop. (Tr. 324). He testified that (Tr. 324–325):

"When I got over on that sidewalk I was free. Whoever had me in a stranglehold didn't have me any longer. And there was a Negro male standing in front of me, and I grabbed him by his right shoulder and pushed him up to the white wall of the barber shop and I said, 'Put your hands up and stay against that wall.'

Q. Why did you grab that individual?

A. Well, at the time I thought that was the guy that had me around the neck."

Agent Snyder then identified Robinson as the man he put against the wall. Snyder then testified that when he pushed Robinson against the wall, Robinson put his hands up and stood toward the wall, but that he had his head turned looking at Snyder. Snyder then testified that he was hit from behind and picked up in the air. Robinson "turned off the wall and came at" Snyder (Tr. 326), and grabbed him. (Tr. 347). Snyder said he tried to hit Robinson with his revolver. (Tr. 326, 347). He then remembered being spread out on the hood of a car. (Tr. 325–326).

Another government witness, Carol Jean Wright, testified on direct examination that she recognized Robinson in the group approaching the agents. (Tr. 1196). She stated that she had known Robinson for ten years. (Tr. 1196–1197). She said she saw a fight occur. (Tr. 1198). When asked what men were involved in the fight she said "I just saw the men that had walked up. I don't know who." (Tr. 1198). She stated that she then went into her house. (Tr. 1199). She came out two minutes later and said that one of the agents had a gun pulled out on Robinson. (Tr. 1199). On cross-examination, she stated

that Robinson had come across the street to where one of the agents was, and that, in response to a question as to what Robinson did, she said "I don't know what—all I saw was the agent when he had his gun out and he said 'Halt.'" (Tr. 1205). She was then asked: "And you didn't see Billy do anything," to which she answered "No, I did not." (Tr. 1205).

The testimony of Carol Wright observing Agent Snyder holding a gun on Robinson and recognizing Robinson in the group of individuals at the scene has probative value which the jury may consider even though she testified at one point that she did not see Robinson "do anything."

Twilley McCreedy testified that he saw Robinson kicking a man on the sidewalk (Tr. 1050–1051), and that Robinson was kicking the agent "like you would kick a football." (Tr. 1052–1053). On recross, McCreedy said that he "can't be too sure really" of Robinson's presence at the scene of the attack. (Tr. 1123).

Ernestine Barber testified that she saw Robinson in the group before the fight (Tr. 445), that, although she had not known the defendant for too long a time, he used to come around to her house "once in a while." (Tr. 447). She also identified Robinson in court. (Tr. 445).

The Court holds that the identification testimony and evidence were sufficient for a jury to find that Robinson was in the group of individuals who confronted Agents Snyder and Grant, and that Robinson was among the individuals who participated in the attack. There was also sufficient evidence that both of the agents adequately informed the group of individuals that they were FBI agents, and that they had Robert Barber in custody, and that they should let the agents and Robert Barber pass. (Tr. 232, 323–324).

Robinson further argues that he was deprived of a fair trial because of unfair comments made by the prosecuting attorney during his summation. During his summation, the District Attorney stated (Tr. 2119):

"Snyder was forced against the wall of the barber shop. Snyder grabbed hold of the individual who had him around the neck. This was Robinson."

Robinson states that Snyder did not testify that he, Snyder, was forced against the wall of the barber shop and that Snyder did not testify that Robinson had him around the neck. Robinson notes that Snyder testified that he did not know who had him in the stranglehold (Tr. 324) and that "At the time I thought that [Robinson] was the guy that had me around the neck." (Tr. 324–325).

The summation of the District Attorney would have been accurate if he had said "Snyder grabbed hold of the individual whom he then thought had him around the neck. This was Robinson." Assuming, then that the District Attorney's remarks were a misstatement of the evidence, this misstatement is not sufficient to warrant an acquittal or the granting of a new trial. The District Attorney made what in effect was a retraction of this statement, although this retraction could have been more artfully expressed. He stated (Tr. 2397):

"Now I want to straighten one thing out: I never said that Agent Snyder testified that Robinson had him in a stranglehold. I was reading from written notes in which I indicated that Robinson had him around the neck. In my running account of what Snyder testified to this is what I said: * *." (The District Attorney then read a brief excerpt from his previous summation in which he repeated the challenged statement.)

Robinson further asserts that there was error in the statement of the District Attorney in his summation that Robinson had testified he left his house about 7:30 P.M. and that Robinson also "stated that he did not remember telling FBI agents that he left between 5:00 and 6:00 P.M." (Tr. 2155). This is

an accurate summation of Robinson's testimony on this point concerning his interview with the FBI. (Tr. 1602–1604). There was no misstatement of testimony by the District Attorney on this point. The District Attorney never stated in summation that Robinson had contradicted himself concerning these times.

■ Nor was it prejudicial error calling for a new trial for the District Attorney to have stated in summation:

"Now if Ernestine Barber is telling the truth—and I believe if any witness has ever had great credibility, it is Ernestine Barber * * *."

(Tr. 2389), and also

"There is no question in the Government's mind—there can be no question in your minds—that all, each and every one of these defendants, is guilty as charged in all four counts beyond a reasonable doubt."

(Tr. 2398–2399). It is generally not proper to use such words as "I believe" or "I personally believe" in summations, and the Court so warned all counsel prior to their summations. (Tr. 2103). The two statements objected to were, however, simply not of such character, in the context and manner spoken, to warrant a new trial in the interests of justice.

Robinson also attacks another statement of the District Attorney contained in his summation (Tr. 2397):

"Again this defendant's counsel attacked the credibility of the testimony of Mrs. Wright, yet Mrs. Wright testified that she had known William Robinson for ten years. Now, if you know somebody for ten years and you see them in a fight on a corner, you know who they are. This young mother was not asked by the Government to look into the faces of any defendant in this Courtroom, and that is why she was not asked to look for and pick out Robinson."

■ Robinson states that there is no testimony by Carol Wright that she saw

William Robinson engaged in a fight on the corner. The Court believes that since she stated that she saw Robinson in the group of men approaching the agents (Tr. 1196), that she saw a fight occur (Tr. 1198), that when asked what men were involved in the fight said "I just saw the men that had walked up. I don't know who," (Tr. 1198), and later saw an agent with a gun pulled on Robinson (Tr. 1205), the statement by the District Attorney was not of such a nature as to call for a new trial. Nor is it grounds for a new trial that there may have been no evidence explaining why Mrs. Wright was not asked to identify Robinson in the courtroom.

Robinson also renews his motion for a new trial and severance, alleging that it was a denial of due process of law to try the defendants jointly. As stated previously, the Court has already determined this question adversely to Robinson in United States v. Barber et al., 296 F.Supp. 795 (D.Del.1969).

Contrary to Robinson's contention, the Court finds that it gave a sufficient charge on the question of identification (Tr. 2412–2415).

### Defendant Manuel T. Brunswick

■ Defendant Brunswick argues that this Court erred in denying his motion for acquittal as to Count 4. This count charged that Brunswick "did rescue and did instigate, aid and assist the escape of Robert Lewis Barber * * *" in violation of 18 U.S.C. § 752(a). Brunswick states that the deduction most consistent with the Government's position at the trial is that Brunswick was a "late-comer" to the scene of the altercation. There is no evidence, Brunswick asserts, that the agents had Robert Barber in their custody, i. e., their physical control, at any time Brunswick was alleged by witnesses Deborah Price and Catherine Butler Wright to be at the corner of Twenty-second and Pine Streets. Brunswick states that if Barber's fleeing was not shown to have occurred when Brunswick was alleged to

have been on the scene, there is a complete failure to establish that he instigated, aided or assisted Barber's escape from custody.

In support of this position, Brunswick relies upon Orth v. United States, 252 F. 566 (4th Cir. 1918). In *Orth*, the defendant was convicted under the Act of March 4, 1909, ch. 321, § 141, 35 Stat. 1114, which was the predecessor of 18 U.S.C. § 752. One Fay escaped from the Atlanta, Georgia penitentiary on August 29, 1916. On September 23, 1916, he appeared in Charleston, South Carolina, where the defendant Orth lived, and was aided and protected, and assisted to leave Charleston by Orth. For these acts Orth was convicted of aiding, abetting and assisting the escape of Fay, and also harboring and concealing Fay. The Court of Appeals held that Orth should have been acquitted on the aiding and abetting charge, although he could properly be convicted for harboring and concealing Fay. The Court said (252 F. at 568):

> "The evidence furnished no foundation for conviction of the charge of aiding Fay to escape from lawful custody. When the physical control has been ended by flight beyond immediate active pursuit, the escape is complete."

It should be noted that in *Orth* it was nearly a month between the escape and the giving of assistance to the prisoner by Orth, and that the assistance was given in a city far from the place of escape. By contrast, in the case at bar, even assuming that Barber had begun running away when the fight had begun, the evidence put Brunswick on the scene very shortly thereafter when there had not been "flight beyond immediate active pursuit." Thus, although Brunswick might have been a late-comer to the scene, his participation in the assault of the agents may have aided Barber's escape by hindering immediate active pursuit by the agents.

Brunswick was acquitted of the conspiracy to prevent by force, intimidation and threats the two Special Agents from discharging their official duties, but was convicted under Count 4 for aiding and assisting the escape of Robert Lewis Barber. This is anomalous, Brunswick contends, since evidence of the same character was assertedly needed to sustain conviction on both of these counts. This argument is without merit. The essence of a conspiracy charge is an *agreement* between persons. The jury might well have decided that Brunswick, as a late-comer to the scene, having heard from independent sources about the fight and the reason for it, joined the fight which was in progress, without any sort of agreement with other defendants. The evidence shows that Ernestine Barber testified that after she saw the group, she ran to 521 Vandever Avenue (Tr. 448–449), around the corner from Pine Street. (Tr. 450). Miss Barber stated that Brunswick asked her what she was running for, "And I told him my brother was down on the corner with those FBI agents." (Tr. 450–451). From this information, Brunswick could have learned the reason for the fight, and decided independently to join in the fight.

Brunswick next asserts that a new trial should be granted as to Count 2 because the verdict was against the weight of the evidence. The Court finds that the weight of the evidence supports the jury's verdict.

The direct testimony which placed Brunswick on the scene is as follows: Catherine Butler Wright said that she was walking up Pine Street between 3:30 and 4:00 P.M. (Tr. 560–561). She walked to the corner of Solan's Store and then she went to the barber shop corner. (Tr. 561). She identified Brunswick as "standing around the crowd" which was around the agent. (Tr. 563). She testified that she saw Brunswick "near the agent" and "trying to get at the agent" with his hands. (Tr. 569). She said Brunswick was "Like trying to grab" the agent. (Tr. 569–A). She stated that Brunswick was as close to the agent as she was to the court report-

er who was sitting next to the witness stand. (Tr. 570).

The witness Deborah Price testified that she saw Brunswick fighting with the agents. (Tr. 765). She identified him as one of "[S]everal male youths beating on two agents." (Tr. 765). She said she really didn't know Brunswick because she hadn't really come in contact with him (Tr. 766) but had seen him several times, usually walking up and down Pine Street. (Tr. 766). She said she saw Brunswick holding an agent by his arms against a car (Tr. 768, 916) and that Brunswick "jumped up and kicked him [an agent] in the side." (Tr. 769–771).

Opposed to the testimony of the above witnesses, Harold Faulkner, a government witness, testified on cross-examination, that he had told FBI agents that he knew Brunswick and that he was not one of the group who attacked the agents. (Tr. 747). Carolyn Parker, another government witness, testified that she did not see Brunswick at the scene and that she would have been able to identify him if she had seen him there. (Tr. 999). Ernestine Barber, who had been asked by FBI Agents if Brunswick were at the scene said on cross-examination that she told the FBI that she did not see Brunswick in the crowd. (Tr. 474). In addition, there is testimony of defendant Brunswick's witnesses which if credited by the jury tends to establish that he was elsewhere during the time the encounter and fight with the agents took place.

The Court does not find that this evidence, favorable to Brunswick, is such as to warrant a new trial. The fact that certain government witnesses did not identify Brunswick as being at the scene does not mean that he was not there. There is no reason to think that every witness should be able to identify every person who was involved in the affray. If Brunswick arrived on the scene late, this would give witnesses less of an opportunity to notice his presence. As

for Brunswick's own witnesses, the jury either could have disbelieved such witnesses or, more probably, could have believed that Brunswick's movements were such that he was where his witnesses placed him, but that he also participated in the fight at an earlier time, i. e. the jury could have believed that he joined the fight late, then left the area, disassociating himself from the affray, and thereby attempting to establish an alibi.

Brunswick finally moves for a new trial on the ground of newly-discovered evidence. In support of this motion, he has submitted the affidavits of two co-defendants, Mowbray and James Barber. Each of these affidavits allege that the individuals (Mowbray and Barber) were at the scene of the attack, that they knew the defendant Brunswick, and that they did not see Brunswick at the time of the incident, and that had he been there, they would have seen him.

This evidence will not support a motion for a new trial, for it is merely cumulative and not of such nature that it would probably produce an acquittal at a new trial. United States v. Rutkin, 208 F.2d 647, 654 (3d Cir. 1953). The evidence is cumulative in that it merely adds to that testimony of other witnesses, referred to above, who testified that they did not see Brunswick at the scene. Harold Faulkner, Carolyn Parker, and Ernestine Barber, all government witnesses who were present at the scene of the affray, testified either that they did not see Brunswick at the scene, or did not see him in the group which attacked the agents.[7]

The defendant urges that the testimony of Barber and Mowbray is highly important because none of the defendant's witnesses at trial were present at the scene, and, therefore, could not "state directly and categorically" that Brunswick was not present at the scene.[8] Yet the above cited testimony indicates that the defendant did have the benefit of

7. See, p. 31, supra.

8. Def.Br. p. 15.

such evidence i. e. the testimony of witnesses present at the scene who testified that Brunswick was not there. It is certainly immaterial that the witnesses giving such testimony were called by the government rather than by the defendant.

Moreover, no effort was made by the defendant, so far as is known, to subpoena other witnesses present at the scene to testify on his behalf at trial, although there is testimony in the record that between thirty and fifty persons witnessed the incident.

For the foregoing reasons, the motions of defendants White, Loper, Robinson, and Brunswick for a judgment of acquittal and for a new trial must be denied.

An order will be entered in conformance with this opinion.