**UNITED STATES of America,
Plaintiff,**

v.

**William H. ROBINSON, Defendant.**

**Crim. A. No. 1926.**

United States District Court,
D. Delaware.

June 23, 1972.

Norman Levine, Asst. U. S. Atty., Wilmington, Del., for the United States.

David T. Dana, III, of Richards, Layton & Finger, Wilmington, Del., for William H. Robinson.

## MEMORANDUM OPINION

LATCHUM, District Judge.

This case is again before the Court on remand from the United States Court of Appeals for the Third Circuit for the purpose of reconsidering the motion of William H. Robinson ("Robinson") for reduction of his sentence in the light of

additional information which was to be submitted to this Court pursuant to an order[1] of the Court of Appeals, dated February 22, 1972.

Robinson was convicted in this Court on May 8, 1969 after a three week jury trial on four counts[2] of an indictment charging him with violations of federal law in connection with a vicious and unprovoked attack upon two F.B.I. agents and with aiding an escape of an army deserter held in the agents' custody. The nature and circumstances of the offenses were particularly reprehensible. At approximately 3:30 P.M. on October 29, 1968 in the vicinity of Twenty-second and Pine Streets, Wilmington, Delaware, Robinson with a group of other young men confronted Special Agents Frank Grant and James D. Snyder who then had Robert Barber, an army deserter, in custody. Robinson and the group without justification attacked the two agents and assisted Barber's escape. Both agents were brutally beaten, one being severely kicked in the head.

Robinson and the others who participated in the attack were indicted by the Grand Jury on November 11, 1968. A warrant issued forthwith for Robinson's arrest. Robinson could not be found in this District because he had fled shortly after the commission of the crimes. Robinson did, however, return voluntarily to Delaware and through his court-appointed counsel surrendered to the Marshal of this District on January 22, 1969. Robinson was released from custody on March 12, 1969 pending trial pursuant to the provisions of the Bail Reform Act, 18 U.S.C. § 3146.

Following his conviction, Robinson moved for a post-trial judgment of acquittal and for a new trial. This motion was denied. United States v. Barber et al., 303 F.Supp. 807, 815–818 (D.Del. 1969). On August 26, 1969 Robinson was sentenced to a maximum prison term of fifteen years.[3] After Robinson was sentenced, his bail bond sureties requested to be exonerated. This request was granted. Robinson was then taken into custody again by the Marshal who transferred him to the Federal Penitentiary at Lewisburg, Pennsylvania on September 10, 1969. He was moved from Lewisburg to the Federal Penitentiary at Atlanta, Georgia on April 4, 1970. On May 12, 1970, Robinson was released from prison pending determination of his appeal by an order of the United States Court of Appeals. He remained at large until April 15, 1971. On April 14, 1971, Robinson's conviction was affirmed by the Court of Appeals for the Third Circuit. United States v. Barber et al., 442 F.2d 517, 521–522 (C.A.3, 1971). The following day, Robinson was returned to custody and incarcerated pursuant to his sentence in the Federal Penitentiary at Atlanta.

On May 7, 1971, Robinson again moved for a new trial on the ground of newly discovered evidence. This motion

---

1. The certified judgment in lieu of mandate of the Third Circuit remanding this case for reconsideration was received on March 21, 1972. (Docket Item No. 470). Robinson's motion for reconsideration of reduction of sentence was filed on May 30, 1972. This Court scheduled a hearing on the motion for June 1, 1972.

2. The four count indictment charged Robinson with (1) assault or aiding and abetting an assault with a dangerous weapon upon F.B.I. Agent Frank Grant in violation of 18 U.S.C. § 111 and 18 U.S.C. § 2; (2) assault, or aiding and abetting an assault, upon F.B.I. Agent James D. Snyder also in violation of 18 U.S.C. § 111 and 18 U.S.C. § 2; (3) conspiring to prevent these agents from performing their official duties, in violation of 18 U.S.C. § 372; and (4) assisting their prisoner, Robert L. Barber, to escape, in violation of 18 U.S.C. § 752.

3. Robinson was sentenced to ten years on Count 1, three years on Count 2, five years each on Counts 3 and 4. The three year sentence on Count 2 is to run concurrently with the ten year sentence on Count 1 and the sentence of five years on Counts 3 and 4 are to run concurrently. The ten year sentence on Count 1 and the five year sentence on Count 3 are to run consecutively for a total maximum prison term under said sentences of fifteen years.

was denied. United States v. Robinson, 329 F.Supp. 723 (D.Del.1971). On May 10, 1971, Robinson also moved under Rule 35, F.R.Crim.P., for a reduction of sentence and requested a hearing. A hearing was held on May 20, 1971 at which time testimony was taken and additional reports from the prison authorities were received. The Court, after weighing all the relevant facts then before it, denied the motion to reduce the sentence.

Upon appeal, an additional psychiatric report by Dr. Harold Kaufman, not before available, was filed by Robinson in the Court of Appeals. The Government stipulated that this report should be made available to this Court. Whereupon this Court's order, denying the motion for reduction of sentence, was vacated and the record remanded to this Court for reconsideration in the light of Dr. Kaufman's report and later prison progress reports to be submitted.

On May 26, 1972, Robinson requested a hearing which the Court promptly set for June 1, 1972. Robinson's formal motion for reconsideration of reduction of sentence and supporting exhibits [4] were filed on May 30, 1972. At the hearing, Robinson presented one witness and additional material for the Court to consider.[5] The Government stated that a recent psychiatric report had been mailed by the prison authorities from Atlanta and requested leave to file that report as soon as it arrived. This was permitted with the understanding that Robinson's attorney would be provided with a copy and an opportunity to reply or comment upon the report if his attorney deemed that necessary.[6]

Robinson's motion requests that his present sentence be reduced to the time he has now served, or alternatively, that he be re-sentenced under 18 U.S.C. § 3651, that is, that his present prison sentence be suspended and he be placed on probation for a suitable length of time. Indeed, Judge Hastie's concurring opinion in United States v. Barber, 456 F.2d 579, 581 (C.A.3, 1972) strongly suggests that Robinson should be placed on probation; he wrote: "On the other hand, to release him as a probationer would return to the community one who already has demonstrated the will and the capacity to be one of its most useful and socially helpful young members."

Despite whatever merits there might be to the suggestion that Robinson now be placed on probation under 18 U.S.C. § 3651, it is clear that this Court is without power to do so. In Ex Parte United States, 242 U.S. 27, 37 S.Ct. 72, 61 L.Ed. 129 (1916), the United States Supreme Court held that a federal court has no inherent power to suspend the execution of a sentence which it has imposed or to place a defendant on probation. The Court held that this could be done only with congressional authorization. In 1925 Congress enacted a Probation Act [7] which specifically empowered federal courts to make such a disposition in criminal cases. That act became the sole source of the probationary power exercised by federal courts. Under the present Act, 18 U.S.C. § 3651, while a district court is authorized to suspend the imposition or execution of sentence and place a defendant on probation, it has no power to suspend a sentence without also imposing a term of probation. United States v. Sams, 340 F.2d 1014, 1020 (C.A.3, 1965), cert. den. 380 U.S. 974, 85 S.Ct. 1336, 14 L.Ed.2d 270 (1965). The Court's authority arises "upon entering a judgment of conviction," 18 U.S.C. § 3651, and it ter-

---

4. Docket Item No. 475.

5. Docket Item No. 476, Exhibits 6, 7, 8 and 9.

6. On June 2, 1972, the Court received a psychiatric report of Robinson from Joseph F. Alderete, M.D., U.S. Penitentiary Hospital, Atlanta, dated May 30, 1972. (Docket Item No. 476, Exh. 5). The defendant replied to this report on June 16, 1972 and submitted a report of Dr. Irwin G. Weintraub. (Docket Item No. 476, Exh. 10).

7. Act of March 4, 1925, c. 521, 43 Stat. 1259; now 18 U.S.C. § 3651–3656.

minates when the convicted defendant actually enters upon the service of his prison sentence. Affronti v. United States, 350 U.S. 79, 76 S.Ct. 171, 100 L. Ed. 62 (1955); United States v. Murray, 275 U.S. 347, 48 S.Ct. 146, 72 L.Ed. 309 (1928). Thus, once a convicted defendant has commenced to serve his prison sentence no later order suspending the execution of the balance of the sentence can be validly entered. Affronti v. United States, supra; Pernatto v. United States, 107 F.2d 372, 373 (C.A.3, 1939). The beginning of the service of the prison sentence is the time limit placed on the exercise of the Court's probationary power and Rule 35, F.R. Crim.P., has no effect whatever upon the Court's power to suspend sentence and to grant probation. Glouser v. United States, 340 F.2d 436, 437 (C.A.8, 1965), cert. den. 381 U.S. 940, 85 S.Ct. 1776, 14 L.Ed.2d 704 (1965); Kelley v. United States, 209 F.2d 638, 639 (C.A. 10, 1954).

■ In the present case, Robinson long ago commenced serving his prison sentence, and this Court is now powerless to suspend the execution of the remainder of the sentence and to grant probation as requested by Robinson and as suggested by the concurring opinion of the Court of Appeals.

■ Of course, this Court is authorized within the time limit set in Rule 35, F.R.Crim.P., to reduce the amount of time to be served in prison. The fifteen year prison sentence[8] imposed upon Robinson was clearly a legal sentence. It was well within the twenty-four year statutory limit set by Congress for the offenses of which Robinson was convicted. Indeed, Robinson does not challenge the sentence on the ground that it was illegally imposed. Rather, he seeks the reduction of a lawful sentence. Such a motion is "essentially a plea for leniency", Poole v. United States, 102 U.S. App.D.C. 71, 250 F.2d 396, 401 (1957), and is addressed to the sound discretion

of the trial court. United States v. Garrick, 399 F.2d 685 (C.A.4, 1968); Jacobsen v. United States, 260 F.2d 122 (C. A.8, 1958).

The question then becomes whether the circumstances of this case justify any greater leniency than has already been shown. Robinson, who was born on April 27, 1944, grew up as one of four illegitimate children with a home life that has been described as extremely deprived both emotionally and economically. Despite these obstacles Robinson graduated from the H. Fletcher Brown Technical High School in Wilmington in June 1962. There is no indication of any serious misbehavior while he was a student. He was first arrested and convicted on a charge of common nuisance in December 1962. From the time of his graduation from High School until March 1963 Robinson was employed as a welding apprentice. In March 1963, he enlisted in the United States Marine Corps because he could no longer tolerate his home situation and because he was "fed up" with his job. After joining the Marine Corps Robinson found that he could not stand marine training and as time passed he was frequently in trouble for petty acts of disobedience and disrespect. Finally he was so "fed up" with "everybody being on my back", that upon receiving orders for Guam, he absented himself without leave on September 10, 1964. On November 19, 1964 at his mother's urging, he returned to his Marine Base and was sentenced to hard labor for two months.

While imprisoned, he was referred to Dr. L. C. Harris, Jr., a U.S. Navy Psychiatrist, for an examination. Dr. Harris' report of January 10, 1965 states, in part:

"On examination, he is a downcast, sullen, petulantly defiant young man who makes no effort to conceal his anger and who openly requests that he be found unsuitable for the service. His speech is soft and slurred, he

---

8. Robinson would become eligible for parole after serving five years of the sentence imposed on August 26, 1969. 18 U.S.C. § 4202.

makes no effort to speak clearly. His entire manner is that of passive obstructionism and defiance. In the course of the interview it becomes apparent that he trusts no one, that he sees himself against the world and believes that he has never been given a fair shake by anyone. He seems to believe that any means of getting his way is fair, that 'everybody is out to get you' so why not 'do some getting yourself', etc. There is no evidence of psychosis or psychoneurotic disorder.

The past history is as obtained from the Correctional Counselor. The history is one of profound emotional, social, and financial deprivation. With great bitterness he speaks of his mother's abandoning him and his siblings to their own devices while she went her way. He cannot trust even her, etc. There is a long history of defiance of persons in authority and he has, since childhood, been engaged in petty acts of disobedience and disrespect of persons in authority. There is a constant theme that no one can be trusted, that everyone is out to get you, etc. He views his difficulties as always having been caused by others, etc.

Impression: PASSIVE AGGRESSIVE PERSONALITY, #3211, manifested by sullen petulance and defiance, passive obstructionism, suspicion of others with paranoid trends, inability to establish meaningful inter-personal relations for fear of being disadvantaged, etc. It is the opinion that there is evidence of long standing psychopathology of a characterlogic nature, and that this man suffers a disorder of personality of such severity as to preclude his being of further service in the United States Marine Corps. It is further the opinion that counseling and/or confinement will not prove corrective. It is recommended that he be discharged from the service in accordance with Marine Corps Manual, Article 13265." (Docket Item No. 476, Exh. 1).

Upon his discharge from the Marine Corps in February 1965, he returned to Wilmington to his old job as an apprentice welder where he worked until March 1966. He was considered by his employer as an average worker but lacked enthusiasm. Two months after his return from the Marine Corps on April 11, 1965 he was arrested and convicted of disorderly conduct, resisting arrest, consumption of alcoholic beverages by a minor and assault on the arresting police officer. The following day he was arrested and convicted of speeding. In December 1966, he was arrested and convicted of driving under the influence. Robinson worked for another employer from March 1966 until April 30, 1968 when he was dropped from employment because he did not return to work after a granted leave of absence.

Six months later he was involved in the present offense. Robinson during the trial took the stand to deny his involvement and offered other witnesses who testified he was at home when the attack occurred. The jury by its verdict rejected his alibi defense. The evidence clearly demonstrated beyond a reasonable doubt that Robinson was a leading and principal participant in the attack upon the F.B.I. Agents.

After sentencing, while Robinson was in custody at the Delaware Department of Correction, he participated in an effort to stir-up a prison riot. As a result thereof, the Delaware authorities requested Robinson be transferred to a federal prison. (Docket Item No. 476, Exh. 3). Upon transfer to Lewisburg, Robinson again was given a psychiatric evaluation on October 13, 1969 at the request of his case worker who stated:

"Robinson impresses as an individual who is extremely bitter. He views his present circumstance as a culmination in a series of events in which he feels society has set about to cause him harm. He has extreme racial views as evidenced by the contents of his correspondence and he should be viewed as a potentially dangerous person until

he can resolve his personal problems." (Docket Item No. 476, Exh. 3).

Dr. Wolfram Rieger, after examining and interviewing Robinson at Lewisburg, wrote:

"On page 8 of his presentence report is an excellent psychiatric evaluation by Dr. Harrison, [sic], Jr., Navy (U. S.) Psychiatrist. I fully agree with that report, and I would just like to emphasize that although the word 'paranoid' was used, it only means that this man is suspicious, hypervigilant and defiant but not that he is psychotic. This man is fully competent, coherent and relevant in his speech.

* * * * * *

He states he does not intend to do anything that would potentially give him more time. Since he is hostile and aggressive, he should be watched closely.

Robinson has at this point no intention of participating actively in his rehabilitation. He does not want to participate in group or individual therapy." (Docket Item No. 476, Exh. 3).

While at Lewisburg between September 10, 1969 and April 4, 1970 Robinson received a conduct report for attempting to introduce contraband (a picture) from the visiting room. He admitted ownership of the contraband picture but would answer no further questions regarding it. He forfeited ten statutory "good time" days for this prison rule violation on October 20, 1969.

On May 12, 1970 he was released on bail pending appeal of his conviction by the Court of Appeals and he remained at large under the supervision of the Reverend Felton May until April 15, 1971. During this period of rather close supervision, Robinson appeared to have changed his ways. He obtained regular employment as a laborer and performed his work well. In addition, he voluntarily took on several community improvement projects which are summarized in the concurring opinion of the Court of Appeals. Testimony of his conduct during this period was received at the May 20, 1971 hearing on Robinson's motion for reduction of sentence.

During this period, his custodian and other community members undertook an organized campaign to obtain signatures to petitions and testimonials in Robinson's favor for use in requesting a reduction of Robinson's sentence.

Upon affirmation of his conviction, Robinson was returned to the United States Penitentiary at Atlanta on April 28, 1971. On May 25, 1971 he was reported for refusing to obey orders in the dining room and refusing to give his name and number. This incident occurred when Robinson was placed at the steam table to issue the meat. Robinson started giving more than one helping of rationed meat to each inmate. When he was told by his supervisor to give only one ration of meat, he responded that he was going to give as many as they wanted and proceeded to do so. When asked for his name and number, he replied: "You find it out."

The Atlanta prison authorities on May 28, 1971 in a special progress report to this Court stated:

"He is a very vocal individual who talks freely of his offense, however, he attempts to minimize his involvement. He exhibits a strong degree of hostility and is very aggressive. It is felt that if he is able to resolve his personal problems, he could become a useful member of society. Robinson has salable skills as a welder and printer, and does show some potential as an organizer and leader. He is very vocal about his feelings and is apparently unable to control his hostility which has caused him considerable difficulties. His present attitude would undoubtedly cause him considerable trouble in an [un]controlled setting and in the community since it is easy to misunderstand him. It is felt he should be maintained under close custody for observation purposes and reassign[ed] to a detail which

will challenge his intellectual ability." (Docket Item No. 476, Exh. 4).

On the basis of the above cited record, this Court on July 26, 1971 was of the opinion that his sentence should not be reduced. Observation of Robinson by this Court during the pre-trial proceedings and throughout the three week trial confirmed the fact that Robinson was impulsive, hostile and potentially dangerous. While his behavior during release pending appeal appeared inconsistent with his long history of defiance, this Court concluded that for the period of time that he was closely supervised by his custodian he made extraordinary efforts to repress his hostility toward authority and to re-direct it against the social evil of drug traffic and users. This Court was unable to conclude that his conduct during the period of release was due to any permanent basic character change.

Upon appeal, Robinson submitted to the Court of Appeals a Psychiatric Assessment of Robinson prepared by Dr. Harold Kaufman, dated January 11, 1972. Dr. Kaufman, a psychiatrist in private practice, had examined Robinson at the request of Robinson's attorney and a committee of friends while Robinson was confined in the District of Columbia jail.[9] This report, of course, was never before available to this Court. As a result of two interviews with Robinson extending over a two and a half hour period, Dr. Kaufman opined, in part:

"It is my psychiatric finding from these examinations that Mr. Robinson is not at this time suffering from a mental illness, nor is he dangerous to the community, violence prone, nor antisocial.

"It is my conclusion, furthermore, that the findings of the report of L. C. Harrison, [sic] Jr., U.S. Navy Psychiatrist in 1965, that Mr. Robinson is a passive-aggressive personality with paranoid trends are no longer valid. Moreover, Dr. Harrison's [sic] find-

ings of bitterness, hostility and inability to trust anyone no longer are in evidence.

"The findings of Wolfrom Reiger, [sic], M.D., a psychiatrist at the United States Penitentiary, Lewisburg, Pa., of November 3, 1969, that Mr. Robinson was suspicious, hostile and defiant, and indicating that he is hostile and aggressive, are, in my professional opinion, no longer valid at this time.

\*    \*    \*    \*    \*    \*

"To reiterate in summary, Mr. Robinson is not suffering at this time from a psychiatric disorder of any kind. It is my impression that rather than being destructive, hostile, bitter, distrustful, impetuous, anti-white and anti-social person, he is fully rehabilitated; and incarceration would not serve the purpose of changing him to become a more constructive person.

"Rather, in my professional opinion, that change has already taken place, and Mr. Robinson if released from custody, would not be a danger to either the White or Black communities, but would make a substantial contribution to improving race relations and acting as a useful and constructive citizen in whatever community he lived and worked. It is Mr. Robinson's intention to continue to work in the drug abuse prevention field if released from incarceration." (Docket Item No. 475, Exh. D).

Dr. Kaufman explains the basis for his opinion on several things. Robinson was polite, spoke without anxiety, was very calm and rational.

Robinson gave the following version of why Dr. Harris had concluded that Robinson was violence-prone, and this explanation was convincing to Dr. Kaufman:

"Mr. Robinson related to me that as a result of 'being fed up with the Marines' he desired to be discharged aft-

---

9. Robinson was transferred from Atlanta to the District of Columbia jail at his at- torney's request to enable Dr. Kaufman to interview him.

er serving for two years in the Marine Corps with no record of having engaged in violent or hostile behavior. He said 'I heard of guys getting discharged by going to the psychiatrist and talking about hurting people and racism and that sort of thing and the psychiatrist got the general discharge. I thought if I could appear sick, the psychiatrist would get me out of the situation I hated. I didn't want to go to Guam, and so I laid it on pretty thick about resentment and hostility. I downed my mother, my woman and everybody else. I told him I would kill people and stuff. This was all an act because I never felt any of these things. I just wanted out of the Marines because I was fed up. In other words, I lied to the psychiatrist. I can see this was stupid now, but at that time I wanted out. In fact, I probably have not been in more than five fights in my whole life. Just look at my record—back through high school—it is clean. In fact, I'm a coward and have always been afraid of violence. I'm not out to prove anything about what a big tough guy I am.' " (Docket Item No. 475, Exh. D).

On May 24, 1972, Dr. Kaufman, after reviewing the Special Progress Report of the Atlanta Authorities of May 28, 1971 and March 9, 1972, did not change his opinion as to Robinson's complete rehabilitation. (Docket Item No. 475, Exh. E).

The Government has filed a psychiatric report of Joseph F. Alderete, M.D., Chief Medical Officer and Psychiatrist of the U.S. Penitentiary in Atlanta, dated May 30, 1972. Dr. Alderete interviewed and examined Robinson on May 26, 1972. Robinson was also psychologically tested by Dr. Boone, a Clinical Psychologist on Dr. Alderete's staff. As a result of these tests and examination, Dr. Alderete's diagnosis and conclusions were stated as follows:

"IV DIAGNOSIS:

"There is no overt mental illness in this person at this time. He has some paranoid traits, has difficulty in dealing with hostility, has trouble establishing close personal relationships.

"Psychological testing confirmed the above clinical impressions.

"V CONCLUSIONS:

"I find myself at variance with the conclusions of Dr. Harold Kaufman. William H. Robinson still has facets of a passive aggressive personality with paranoid trends, as reported by Dr. L. C. Harrison [sic], Jr., a U.S. Navy psychiatrist in 1965.

"The findings of Dr. Wolfrom Rieger [sic], a psychiatrist at Lewisburg, in November, 1969, that William H. Robinson was suspicious, hostile and defiant and aggressive is still valid. I will admit that in the office setting he was not defiant, and managed to control his hostility which as I stated was just underneath the surface. Under sufficient stress he could become quite aggressive, and aggressivity could manage to manifest itself in violence.

"I see no objective evidence that William H. Robinson has basically changed or become rehabilitated to such an extent that if placed in a similar stressful situation that he was originally at the time that he lost control and assaulted the F.B.I. Agent, that he would not react again in a violent manner. His letter to the Judge in 1971, after his appeal was turned down reflects his low frustration tolerance. While he made every effort to put up a pleasant facade in the office interview with both Dr. Boone and myself, I would predict when he is appraised of my report, I would predict that he will react in a very angry hostile fashion to both Dr. Boone and myself. However, I can not in good conscience state that he is rehabilitated at this time and that if he is released that he would not constitute a danger to the community; since both my clinical evaluation and the completely objective psychological testing indicates that there has been no basic change in the personality pattern structure of William H. Robinson.

"A persons basic personality pattern and characteristics play an important part in the habitual reaction pattern to stress. Therefore, in absence of any objective evidence of any essential change in the basic personality structure and characteristics of William H. Robinson, I can give no professional assurance that if he were placed in a similar stressful situation to the one that led to violence towards the F.B.I. Agent, that he would not repeat the same violent acting out pattern of reaction." (Docket Item No. 476, Exh. 5).

Robinson's attorney was permitted to respond to Dr. Alderete's report and did so on June 16, 1972. (Docket Item No. 476, Exh. 10). His response was directed mainly to pointing out that Dr. Alderete's and Dr. Boone's reports were unsubstantiated and inconsistent and should not be relied upon as a basis for predicting Robinson's behavior if he were released. It was supported by a letter of Irwin G. Weintraub, Ph. D., a local consulting psychologist. Dr. Weintraub, who has never seen or interviewed Robinson, condemned Dr. Alderete's report as containing conflicting conclusions, recommendations and prognoses from those rendered by Dr. Kaufman and those contained in the Special Progress Report of May 28, 1971 and that there are distinct weaknesses in reliance upon the Minnesota Multiphasic Inventory utilized by Dr. Alderete. Dr. Weintraub therefore recommended that Robinson again be psychiatrically and psychologically re-evaluated by private consultants.

■ From this long recital of Robinson's behavior traits, this Court remains unconvinced that Robinson has undergone any remarkable personality change or that he is completely rehabilitated. Robinson is an intelligent person and this Court believes that he has been able on occasions, when it suited his purposes, to conceal his hostility and aggressive tendencies. At the very least the evidence on this point is conflicting and reasonable men might well disagree on the conclusion to be reached. It does not appear, however, that a sufficient showing has been made for this Court in its sound discretion to reduce the valid sentence originally imposed. Nevertheless, since this Court is in effect predicting the future behavior of Robinson for some years to come, this Court is willing to modify the fifteen year sentence originally imposed so as to make him eligible for parole at such time as the Board of Parole may determine under 18 U.S.C. § 4208(a) (2). The effect of this modified sentence will be to place the decision of Robinson's release on parole in the hands of the professionally competent Parole Board. The Board will be in a far better position than this Court or any other Court, for that matter, to evaluate the prisoner's continuing conduct and attitude and to determine when he has progressed to the stage where it is believed that he is ready to return to society with minimal supervision.

Accordingly, Robinson's motion for a reduction of sentence will be denied but his sentence will be modified so as to make him eligible for parole at such time as the Board of Parole may determine.

An order to this effect will be entered.