**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Darryl VOWIELL, Defendant–Appellant.**

No. 87–1039.

United States Court of Appeals,
Ninth Circuit.

Submitted Dec. 16, 1987 *.

Decided March 8, 1989.

* The panel finds this case appropriate for submission *without oral argument pursuant to Ninth* Circuit Rule 34–4 and Fed.R.App.P. 34(a).

Manton L. Selby, San Francisco, Cal., for defendant-appellant.

Mark N. Zanides, Asst. U.S. Atty., San Francisco, Cal., for plaintiff-appellee.

Before FLETCHER, WIGGINS and NOONAN, Circuit Judges.

## ORDER

The slip opinion filed May 5, 1988 is withdrawn;

This Opinion and dissent are hereby filed in its place;

The petition for rehearing filed with respect to the opinion filed May 5, 1988, is rejected as moot;

No further petitions for rehearing will be entertained with respect to this opinion. The mandate shall issue immediately.

SO ORDERED.

## OPINION

WIGGINS, Circuit Judge:

Darryl Vowiell appeals his convictions for offenses stemming from the escape of three federal prisoners. Vowiell claims that the district court erred in admitting the statement of a coconspirator and in giving an ambiguous jury instruction. We REVERSE and REMAND for a new trial.

### I.

#### FACTS AND PROCEEDINGS BELOW

On April 16, 1986, Rodney Murdoch, Sylvia Brown and Shelley Bosch cut through a fence and escaped from the Federal Correctional Institute at Pleasanton, California. David Record met the escapees just outside the fence. Record dropped Murdoch off in San Francisco and drove the two women to Morgan Hill, California, to meet Robert Shutte (aka "B.J."). Shutte did not appear, so Bosch and Brown stayed with Record for two days in San Jose. On April 19, Shutte picked up the women at the prearranged Morgan Hill location and drove them to Bakersfield. Bosch and Brown left Bakersfield one and a half days later on the morning of April 21. All three escapees were subsequently apprehended, tried, and convicted.

According to the evidence presented at trial, Darryl Vowiell, a prisoner at Pleasanton, assisted and conspired to assist in the escape. Murdoch testified that Vowiell offered to obtain bolt cutters, helped arrange for a getaway car and driver, and identified

David Record (the driver) to Murdoch while Record was visiting his sister Kathy, another inmate at Pleasanton, California. Kathy had sent David a postcard asking him to visit her. She then gave him written instructions and a map when he visited her at the prison. Murdoch agreed to pay Vowiell $1,000 for his assistance. Murdoch was to send the money to Randy Whittington in Oildale, California. Randy was the nephew of Billy Ray Whittington. Billy Ray was an inmate at Pleasanton, a good friend of Vowiell's, and a former roommate of Murdoch's. Murdoch also testified that Vowiell asked him to include Shelley Bosch, Vowiell's girlfriend, in the escape.

Billy Ray Whittington corroborated much of Murdoch's testimony regarding Vowiell's involvement in planning the escape. Billy Ray testified that he heard Vowiell and Murdoch discuss the bolt cutters and the getaway car. Billy Ray also helped to arrange for his nephew Randy to receive the money for Vowiell.

David Record also testified for the government. Over defense objection he stated that on April 20, four days after the escape, his sister Kathy told him that:

> Darryl [Vowiell] said that things were hot; they were smoking, the Feds were swarming around, and to get in touch with B.J. and get the girls out of there as soon as possible.

David Record then called Shutte to warn him to get the girls out of Bakersfield. Brown and Bosch left the next morning.

On June 13, 1986, a federal grand jury indicted seven persons for offenses related to the escape. Murdoch, Brown, and Bosch were charged with escape. Vowiell, Kathy Record, and David Record were charged with assisting the escape in violation of 18 U.S.C. § 752[1] and conspiracy to assist the escape in violation of 18 U.S.C. § 371.[2] Shutte was charged with conspiracy and Shutte and David Record were charged with harboring an escapee in violation of of 18 U.S.C. § 1072.[3] All defendants except Vowiell and Shutte pled guilty. Vowiell was convicted after a jury trial of assisting the escape [Count III] and with conspiracy to assist the escape [Count II]. Vowiell was sentenced to one year on each count, the sentences to run consecutive to each other and consecutive to the sentence he was already serving. Vowiell timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

## ANALYSIS

Vowiell claims that the district court erred in admitting his alleged statement that the escapees needed to leave Bakersfield. Vowiell allegedly gave this information to Kathy. She relayed it to David Record who testified at trial. The district court ruled that the statement was admissible as a coconspirator statement under Fed.R.Evid. 801(d)(2)(E). The court found that the statement was made during the conspiracy because harboring is part of the escape process and that for so long as the harboring continues and the prisoners are at large, the escape is not totally complete. Vowiell argues that his statements were not made in the course of and in furtherance of the conspiracy because immediate pursuit had ended and the fugitives were in a place of temporary safety.

> If two or more persons conspire to commit any offense against the United States ... and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned *not more than five years, or both.*

3. Section 1072 provides:

> Whoever willfully harbors or conceals any prisoner after his escape from the custody of the Attorney General or from a Federal penal or correctional institution, shall be imprisoned not more than three years.

---

1. Section 752(a) provides:

> Whoever rescues or attempts to rescue or instigates, aids or assists the escape, or attempt to escape, of any person arrested upon a warrant or other process issued under any law of the United States, or committed to the custody of the Attorney General or to any institution or facility by his direction, shall, if the custody or confinement is by virtue of an arrest on a charge of felony, or conviction of any offense, be fined not more than $5,000 or imprisoned not more than five years, or both....

2. Section 371 provides in part:

In addition, Vowiell argues that the district court gave an erroneous jury instruction on assisting an escape that warrants reversal.

## A. Admission of the coconspirator statement

■ The standard for review of a district court's ruling that a statement was made in furtherance of a conspiracy depends upon whether that ruling is challenged for its factual findings or its legal conclusions. In *Bourjaily*, the Supreme Court looked at whether the district court's factfinding regarding the existence of a conspiracy and the defendant's involvement in it was clearly erroneous. *Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 2782, 97 L.Ed. 2d 144 (1987). In this case, however, the district court engaged in more than pure factfinding; the court made a legal conclusion about when a conspiracy to assist an escape ends. Thus, the district court's decision involved a mixed question of law and fact which this court reviews de novo. *United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). Under this de novo standard, we find that the district court erred in admitting David Record's testimony.

David Record's testimony related two out-of-court statements. The first is the statement by Vowiell to Kathy Record that "things were hot." This statement is not hearsay because it was not offered to prove the truth of the matter asserted. Fed.R.Evid. 801(c). It was irrelevant at Vowiell's trial whether or not Vowiell was correct that "things were hot" and the Feds actually "were swarming." The statement was offered simply to show Vowiell's knowledge of and participation in the escape plans. The second statement is Kathy's statement to David that Vowiell had given her the warnings. This out-of-court statement was only probative if true—i.e., if Vowiell actually told Kathy to instruct Shutte to get the girls out of Bakersfield. David's testimony regarding Kathy's statement was thus only admissible if it fell within a category making it nonhear-

say or within an exception to the hearsay rule.

■ Under Fed.R.Evid. 801(d)(2)(E), the statement of a coconspirator is not hearsay if made "during the course and in furtherance of the conspiracy." Before admitting the statement, the court must determine by a preponderance of the evidence that there was a conspiracy between the declarant and the nonoffering party, and that the statement was made "in the course of and in furtherance" of the conspiracy. *Bourjaily*, 107 S.Ct. at 2779.

Vowiell asserts that the statements he allegedly made to Kathy Record four days after the escape do not fall within the scope of Rule 801(d)(2)(E). He contends that the statements were not "in furtherance of" or "during the course of" the conspiracy to assist the escape because the conspiracy terminated when Bosch and Brown reached Shutte's residence in Bakersfield. Although Vowiell incorrectly focuses on his statements, rather than Kathy Record's, we agree with his analysis. Both Vowiell and Kathy were involved in the same conspiracy. It ended when the fugitives reached temporary safety.

■ The general rule, as set forth by the Supreme Court in *Krulewitch v. United States*, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949), is that extra-judicial statements are not admissible against the nondeclarant if made after the chief objective of the conspiracy had ended either in success or failure. *Id.* at 442–43, 69 S.Ct. at 717–18; *see also Atkins v. United States*, 307 F.2d 937, 940 (9th Cir.1962). We must determine, therefore, whether Kathy's effort to protect the escapees' concealment was done in furtherance of the main criminal objective of the conspiracy to assist the escape, or only to cover up after the crime.

■ Congress has distinguished the crime of assisting an escape from that of harboring or concealing an escaped prisoner. *Compare* 18 U.S.C. § 752 *with* 18 U.S. C. § 1072. Kathy Record was charged with assisting and conspiring to assist the escape; she was not charged with harboring/concealing or conspiring to harbor/con-

ceal the escapees. The crime of aiding an escape terminates once the escapee has reached temporary safety: "When the physical control has ended by flight beyond immediate active pursuit, the escape is complete. After that aid to the fugitive is no longer aiding his escape." *Orth v. United States*, 252 F. 566, 568 (4th Cir. 1918);[4] see Wharton's *Criminal Law and Procedure* § 1370 (1957) (assistance after completion of escape makes one guilty as an accessory after the fact and not as a party to the offense of escape); 4 Wharton's *Criminal Law* §§ 664–665 (1981) (emphasizing departure, rather than absence, from legal custody as hallmark of escape and prison breach); *see also United States v. Randolph*, 261 F.2d 234, 237 (7th Cir. 1958) (distinguishing aiding an escape from post-escape concealment under Illinois law). An interpretation that assisting an escape under § 752(a) included harboring or concealing an escapee would be inconsistent with the clear statutory distinction. Thus, Kathy's alleged statement repeating Vowiell's warning to the fugitives to aid in their concealment did not directly further the primary objective charged to the conspiracy—assisting the escape.

Arguably, Kathy's statement furthered the object of assisting the escape by "covering up" the crime. However, the Court in *Krulewitch* disapproved of extending completed conspiracies by finding implicit agreements to conceal the crime. 336 U.S. at 443–44, 69 S.Ct. at 718–19. The Court reaffirmed and explained this position in *Grunewald v. United States*, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957):

> [A] vital distinction must be made between acts of concealment done in furtherance of the *main* criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained.

*Id.* at 405, 77 S.Ct. at 974 (emphasis in original). The scope of the conspiratorial agreement determines the duration of the conspiracy and whether acts or statements can properly be regarded as in furtherance of the conspiracy. *Id.* at 397, 77 S.Ct. at 970.

In this case, the escapees had reached a place of temporary safety when Kathy Record told David Record what Vowiell had allegedly said. Four days had passed since the escape. The whereabouts of one escapee were unknown and the two others were at Shutte's home in Bakersfield and were not fleeing any immediate pursuit. Any further assistance could have, at most, constituted harboring or concealing. Kathy, however, was not charged with that offense. Nor did the conspiracy charged in the indictment encompass such harboring. Further, there was no evidence that Kathy agreed to assist the escapees beyond leaving the prison confines and making a getaway to some kind of refuge. No ongoing assistance seems to have been contemplated. The central aim of the conspiracy had thus been accomplished long before Kathy Record's statement to her brother.

The Supreme Court's decision in *United States v. Bailey*, 444 U.S. 394, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980), relied upon by the district court and the dissent, does not cast any doubt upon our conclusion. The Court in *Bailey* stated that escape from federal custody is a continuing offense in that "an escapee can be held liable for failure to return to custody as well as for

---

4. *Orth* remains good law. No case has overruled or even criticized it since its publication in 1918. The most recent case citing *Orth* is *United States v. Barber*, 303 F.Supp. 807 (D.Del. 1969), *rev'd on other grounds*, 429 F.2d 1394 (3d Cir.1970). There, the court wrote:

> even assuming that Barber had begun running away when the fight had begun, the evidence put Brunswick on the scene very shortly thereafter when there had not been "flight beyond immediate active pursuit." Thus, although Brunswick might have been a late-comer to the scene, his participation in

the assault of the agents may have aided Barber's escape by hindering immediate active pursuit by the agents.

*Id.* at 819. Thus, even after *Barber*, *Orth*'s essential distinction between assisting escape and harboring escapees remains intact. In this case, in contrast to *Barber*, the defendant allegedly sent a warning after the escapees had reached a temporary refuge. True, federal agents do not seem to have temporarily ceased and then renewed their search. But neither were they "in pursuit." Nor can four days reasonably be said to still encompass "immediate" pursuit.

his initial departure" because of the "continuing threat to society posed by an escaped prisoner." *Id.* at 413, 100 S.Ct. at 636. This case deals only with the law of escape as it relates to the *escapee,* and not at all with assisting an escape, nor with a conspiracy to assist an escape. Moreover, the Court in *Bailey* relied on *Toussie v. United States,* 397 U.S. 112, 90 S.Ct. 858, 25 L.Ed.2d 156 (1970) which cautioned restraint in labeling crimes as continuing, lest the policy of repose embodied in statutes of limitation be violated. *Id.* at 114–15, 90 S.Ct. at 859–60. The policy of repose is not implicated in the case of an escapee at large, as Congress has provided that no statute of limitations will extend to any fugitive from justice. *See* 18 U.S.C. § 3290. But the policy of repose would be undermined if *assisting* an escape is deemed a continuing offense.

The *Bailey* Court's reliance on the escapee's dangerousness also makes clear why the law of escape differs with respect to escapees and those who assist them. Assisting escapees after the escape is complete constitutes a separate crime—harboring or concealing escapees. This separation reflects the different dangers which the two crimes pose-namely, helping to breach legal custody and obstructing justice. In contrast, no *separate* crime exists for not turning one's self in after escaping. As the Supreme Court pointed out in *Bailey,* an escapee can be held liable for not returning to custody, 444 U.S. at 413, 100 S.Ct. at 636, but that conduct is included within the crime of *escape.* Not turning one's self in involves essentially the same danger as escaping—that someone who is supposed to be in legal custody will not fulfill the purpose of that custody.[5]

The government relies on several cases where statements made after the actual commission of the crime were found to have been in furtherance of the conspiracy. In these cases, however, the courts determined that the conspiracy did in fact encompass some further primary purpose.[6] In *Atkins,* for example, this court held in a robbery case that coconspirator statements relating to the division of profits were admissible: "the criminal aim of the conspiracy was not to commit the robbery, but to make a profit by illegal means." 307 F.2d at 940. In contrast, the criminal aim here was to assist an escape which under *Orth* ends when the escapee has reached temporary safety. The evidence does not show a subsidiary agreement to harbor the fugitives nor was such a conspiracy charged in the indictment. *See also United States v. Walker,* 653 F.2d 1343, 1345–51 (9th Cir. 1981), *cert. denied,* 455 U.S. 908, 102 S.Ct. 1253, 71 L.Ed.2d 446 (1982) (holding that fraud conspiracy continued beyond submitting a false warranty until the illegal profits, the main objective, had been secured).

Similarly, in *United States v. Sears,* 663 F.2d 896, 905 (9th Cir.1981), *cert. denied sub nom. Werner v. United States,* 455 U.S. 1027, 102 S.Ct. 1731, 72 L.Ed.2d 148 (1982), this court held that the statement of one coconspirator to innocent third parties to prevent their revealing the robbery was admissible against the other conspirator. The court found that the conspiracy sought both "to rob the Savings and Loan and to escape successfully." *Id. Sears* is distinguishable on several grounds. First, the court there seems to have proceeded, without objection, on the assumption that there was a meeting of the minds to both rob and escape. In contrast, there is no contention

---

**5.** By focusing on *Bailey* and the notion of when an escape is complete with respect to the escapee, the dissent misses the point of our inquiry. The issue before us is when the crime of *assisting* escape is complete, and our analysis simply tracks the federal criminal code's distinction between assisting and harboring. The dissent's difficulty is really not with our discussion of *Bailey* and *Orth,* but rather with the applicable criminal statutes. But *Bailey* and the ethic of

our post-"fox-hunting society" do not invite us to rewrite the criminal code.

**6.** The *Krulewitch* decision makes clear that the courts cannot *infer* a continuing subsidiary objective in every conspiracy to conceal the crime. 336 U.S. at 443–44, 69 S.Ct. at 718–19. In some cases, however, courts have found post-crime activities to be main objectives of the conspiracy.

here that Kathy agreed to assist a post-escape concealment. Second, *Sears* involved statements made while the robbers were in the process of changing their clothes and dividing the proceeds of the robbery. In other words, the coconspirators had not yet achieved the main object of their conspiracy—namely, their each possessing some of the loot. The stealing from the bank was only the means by which to obtain the loot to be divided in accordance with the conspiratorial agreement. *Cf. United States v. De Vaugn*, 579 F.2d 225 (2d Cir. 1978) (statements made after the drugs had been distributed were not admissible in the absence of an agreement between the defendant and the declarant to pursue another transaction or to call back regarding the completed transaction); *United States v. Moss*, 544 F.2d 954, 957–58 (8th Cir.1976) (statements made after robbery proceeds had been divided were not made in the course of the conspiracy), *cert. denied*, 429 U.S. 1077, 97 S.Ct. 822, 50 L.Ed.2d 797 (1977). *Sears* would be analogous only if Kathy had made her statements before the escapees had left the prison grounds or reached temporary safety.

Finally, *Sears* is also distinguishable by reference to the passage of time. In *Sears*, the statements at issue had been made within an hour of the actual robbery at the bank. The coconspirators had been working together right up to and including the time when the statements were made. Here, in contrast, the statements were made four days later, without any prearrangement and long after the escapees, the getaway driver, Kathy Record, and Vowiell had gone their separate ways. *See also United States v. Knigge*, 832 F.2d 1100, 1106 (9th Cir.1987) (coconspirators' statements deemed admissible "related to the plan of action to free the stock, to the division of the spoils, to the accounting for the spoils") *amended*, 846 F.2d 591 (9th Cir.1988).

In sum, a coconspirator statement is only admissible nonhearsay if made during the course of and in furtherance of the conspiracy. To determine whether this requirement is met, we must look, according to *Krulewitch* and *Grunewald*, at whether the main objectives of the conspiracy have been accomplished. Here, the primary object of the conspiracy to assist an escape was the actual escape of the prisoners. Under *Orth*, such a conspiracy ends once the fugitives have passed the point of immediate pursuit. Therefore, Kathy Record's statements to David made four days after the escape while the escapees were temporarily safe in Bakersfield were not made during and in furtherance of the conspiracy under Fed.R.Evid. 801(d)(2)(E) and the district court erred in admitting them.

To determine whether Vowiell's convictions should be reversed because of this error, we must decide whether the admission of David's testimony violated the confrontation clause of the sixth amendment.[7] This court has held that "if the hearsay does not fall into an exception it is conclusively unreliable for the purposes of the confrontation clause ... accordingly, the verdict must be reversed unless the error was harmless beyond a reasonable doubt." *United States v. Bibbero*, 749 F.2d 581, 584 (9th Cir.1984) (quoting *United States v. McKinney*, 707 F.2d 381, 384 (9th Cir. 1983)), *cert. denied*, 471 U.S. 1103, 105 S.Ct. 2330, 85 L.Ed.2d 847 (1985); *cf. Bourjaily*, 107 S.Ct. at 2782 (statements admissible under Rule 801(d)(2)(E) pose no confrontation clause problems simply because they lack independent indicia of reliability).

We cannot find on this record that Kathy Record's statements were harmless beyond a reasonable doubt. As was the case in *Bibbero* and *McKinney*, the evidence of guilt was formidable but not overwhelming and the statement was important to the

---

**7.** The confrontation clause provides:

In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with witnesses against him....

U.S. Const. amend. VI.

government's case. *Bibbero*, 749 F.2d at 584; *McKinney*, 707 F.2d at 385. The evidence of Vowiell's participation in the conspiracy was plentiful, but either circumstantial or based on coconspirator testimony, particularly that of Murdoch, an admitted liar. On the basis of that evidence, Vowiell was clearly involved in the escape, but it is not clear beyond a reasonable doubt that he *conspired* to assist the escape. Kathy Record's statement to David was thus important in proving that Vowiell was a knowing and active conspirator. Her statement showed he knew about the escape's details regarding temporary refuge, and that the escape involved more than Murdoch. Moreover, the prosecutor relied heavily on this statement both in his questioning of David Record and in closing argument.

## B. *Erroneous jury instruction*

The prejudicial effect of David Record's hearsay testimony was compounded by an erroneous jury instruction. The district court charged:

> Now, the assistance charged here is at both ends of the escape process. The assistance and the participation with respect to Mr. Vowiell is at the beginning of the process, in helping to arrange the method of escape, helping to arrange the transportation, *and possibly helping to arrange for the concealment after the transportation had occurred.*

(emphasis added). Vowiell argues on appeal that this jury instruction is an independent ground for reversal. Because defense counsel did not object at trial, we will only reverse if the instruction constituted plain error affecting substantial rights of the defendant. *United States v. Bagby*, 451 F.2d 920, 927 (9th Cir.1971).

■ "[A] conviction should not rest on ambiguous and equivocal instructions to the jury on a basic issue." *Bagby*, 451 F.2d at 927 (citing *Bollenbach v. United*

*States*, 326 U.S. 607, 613, 66 S.Ct. 402, 405, 90 L.Ed. 350 (1946)). It is plain error for a district court to give instructions that permit the jury to convict the defendant for a crime that was not charged, because "'[t]he court may not substantially amend the indictment through its instructions to the jury.'" *United States v. Pazsint*, 703 F.2d 420, 424 (9th Cir.1983) (quoting *United States v. Stewart Clinical Laboratory*, 652 F.2d 804, 807 (9th Cir.1981)); *see United States v. Combs*, 762 F.2d 1343, 1346 (9th Cir.1985).

■ Here, the instruction permitted the jury to convict Vowiell for harboring, a crime with which he was not charged. Nor does the evidence of harboring establish that Vowiell had assisted the escape. The erroneous instruction was prejudicial because it enabled the jury to rely—perhaps even entirely—on the improperly admitted hearsay testimony of David Record, that linked Vowiell to the post-escape concealment efforts. The jury instruction thus constitutes plain error, as it "destroyed the defendant's substantial right to be tried only on charges presented in an indictment returned by a grand jury." *Pazsint*, 703 F.2d at 424 (quoting *Stirone v. United States*, 361 U.S. 212, 217, 80 S.Ct. 270, 273, 4 L.Ed.2d 252 (1960)); *see also Bollenbach*, 326 U.S. at 610, 66 S.Ct. at 404 (1946) (reversing conviction based on instruction that would permit jury to convict defendant as accessory after the fact although defendant not so charged).[8]

## III.

## CONCLUSION

The district court erred in admitting against Vowiell Kathy Record's hearsay statement made four days after the escape once the escapees had reached temporary safety. This error was not harmless beyond a reasonable doubt. We therefore REVERSE Vowiell's convictions for assist-

---

**8.** Furthermore, we note that the challenged instruction, by confounding the two distinct crimes of harboring and assisting, creates the possibility of a non-unanimous jury verdict.

ing the escape and for conspiring to assist the escape and REMAND for a new trial.

REVERSED AND REMANDED.

NOONAN, Circuit Judge, dissenting:

As the court trenchantly sums up the evidence against him, Darrell Vowiell obtained bolt cutters for Rodney Murdock, Sylvia Brown and Shelley Bosch, three prisoners at Pleasanton, arranged for a get away car and arranged to have a driver for the car. A prisoner at Pleasanton himself, Vowiell master-minded the escape of the other three from prison. Four days after the prisoners had gotten out of Pleasanton Vowiell was still giving them advice on how to make their escape good. Nonetheless, the court holds that the conviction of Vowiell should be reversed.

Four days after the breakout, Murdock, Brown and Bosch were still engaged in the federal crime of escape. 18 U.S.C. § 751(a). It is "clear beyond peradventure that escape from federal custody as defined in § 751(a) is a continuing offense and that an escapee can be held liable for failure to return to custody as well as for his initial departure". *United States v. Bailey*, 444 U.S. 394, 413, 100 S.Ct. 624, 636, 62 L.Ed.2d 575 (1980). As the prisoners were still escaping it is very hard to understand why Vowiell in advising them was not committing the crime of aiding or assisting the escape. 18 U.S.C. § 752.

The court intimates that Vowiell was charged with the wrong crime and that he was really guilty of harboring or concealing prisoners after the prisoners escaped in violation of 18 U.S.C. § 1072, "Concealing escaped prisoner." The natural meaning of "harbor" or "conceal" points to persons who provide shelter or equipment to a prisoner who has gotten outside the prison. *E.g., United States v. Eaglin*, 571 F.2d 1069 (9th Cir.), *cert. denied* 435 U.S. 906, 98 S.Ct. 1453, 55 L.Ed.2d 497 (1977). It is difficult to believe that Vowiell, in prison, was concealing the escapees; and "harboring" must be read as parallel to "concealing." While possibly the government might be able to argue that advising

amounts to concealing or harboring, the more evident effect of advising is to assist the escape.

The court relies on *United States v. Orth*, 252 F. 566 (4th Cir.1918). Here Robert Fay escaped from the federal prison in Atlanta on August 29, 1916 and was assisted by the defendant in Charleston on September 23, 1916. The defendant was convicted of harboring a fugitive and of assisting an escape. Reversing the second conviction, the circuit court laid down as the predicate for reversal of this proposition: "When the physical control has been ended by flight beyond immediate active pursuit, the escape is complete." *Id.* at 567. The court cited one American and one English treatise and one Georgia and one North Carolina case for this proposition, but no federal cases. *Orth* did not involve the master-mind of an escape conspiracy, but an apparent stranger who helped Fay. On its facts alone, it is distinguishable from our case. But drawing a distinction is unnecessary. The basic proposition of *Orth* is squarely overruled by *Bailey, supra*.

In *Bailey*, in the course of defining escape from federal custody as a continuing offense, Justice Rehnquist observed: "Moreover, every federal court that has considered this issue has held, either explicitly or implicitly, that § 751(a) defines a continuing offense." *Id.* at 413, 100 S.Ct. at 636, citing cases from the fifth, eighth, and ninth circuits. Justice Rehnquist did not note that *Orth* is *contra*, but of course *Orth* ceased to have vitality after *Bailey* had repudiated its central position.

The Ninth Circuit case cited with approval by *Bailey* is *United States v. Michelson*, 559 F.2d 567 (9th Cir.1977). Like *Bailey*, it dealt with a defense of duress. Like *Bailey* it concluded that escape is a continuing offense. *Id.* at 570. Like *Bailey*, it is contrary to the predicate of *Orth*.

The notion that an escape is complete when physical pursuit has ceased reflects the ethic of a fox-hunting society. When the fox has reached cover, the chase is over. This sporting etiquette has no place

in modern federal law. It has been decisively rejected by the Supreme Court. Darryl Vowiell on April 20, 1986 was still actively engaged in conspiracy to aid an escape that was still in progress.

The court's approach casts a doubt on the general rule of law that an accessory after the fact is "a person who, knowing that a felony has been committed, renders aid to the felon in order to protect him, hinders his apprehension, or facilitates his escape." *Wharton's Criminal Law*, ed. C. Torcia, (1978 & 1987 Supp.) § 33. This normal principle requires that the government prove a felony has been committed; that the defendant knew it has been committed; and that the defendant has then assisted the felon to escape. *E.g., United States v. Rux*, 412 F.2d 331 (9th Cir.1969). This normal principle is the common law rule as to escapes from prison. "If the person rendered aid to the prisoner after his escape, he would be guilty as an accessory after the fact." *Wharton's Criminal Law* § 667. The earlier edition of *Wharton* § 1371 cited by the court says the accessory is not "a party to the offense of escape," only in the absence of a statute. Here there is a statute explicitly focused on aiding an escape. Congress has codified the common law rule as to accessories after the fact in the case of persons assisting an escape. 18 U.S.C. § 752(a). The court mutilates the statute.

I would affirm the decision of the district court.