NOT FOR PUBLICATION

FILED

UNITED STATES COURT OF APPEALS

OCT 15 2024

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 22-50132 |
| Plaintiff-Appellee, | D.C. No. 3:21-cr-03259-LAB-1 |
| v. | |
| REYMUNDO ARREDONDO, | MEMORANDUM* |
| Defendant-Appellant. | |

Appeal from the United States District Court
for the Southern District of California
Larry A. Burns, District Judge, Presiding

Argued and Submitted June 7, 2024
Pasadena, California

Before: CLIFTON, COLLINS, and LEE, Circuit Judges.
Dissent by Judge CLIFTON.

Reymundo Arredondo challenges his conviction of escape from federal
custody, arguing that the government constructively amended or fatally varied the
indictment by relying on a continuing offense theory. We have jurisdiction under
28 U.S.C. § 1291 and affirm.

---

\* This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

On June 6, 2021, Reymundo Arredondo was serving the last month of his federal sentence at OceanView, a halfway house, also known as a residential reentry center (RRC), in San Diego. Arredondo received permission to leave OceanView so that he could go to the hospital, but shortly after he arrived at the hospital, he received word that OceanView believed he had escaped. Arredondo contacted OceanView to explain that he had not escaped, and he was ordered to return. According to an OceanView employee, Yesinia Chavarin, Arredondo returned, but then refused her order to come inside. According to Arredondo, Chavarin denied him entry. Either way, he was arrested four months later while hiking near his mom's house.

Shortly after he was arrested, Arredondo was indicted under 18 U.S.C. §§ 751(a) and 4082(a) for "willfully failing to remain within the extended limits of his confinement and willfully failing to report as directed to a federally contracted facility" on June 6. Arredondo moved for a bill of particulars, asking the government to explain whether the "specific factual scenario of liability for the alleged escape" was "(1) at approximately 2:03 p.m. when Mr. Arredondo's whereabouts were unaccounted for and escape procedures were followed; (2) after 3:25 p.m. when Mr. Arredondo left the RRC facility after being told he was already on escape status and escape procedures were followed; or (3) both."

The government replied, "Defendant is alleged to have committed the offense of escape from Federal custody when, upon returning to the RRC facility at approximately 3:25 PM on June 6, 2021, Defendant then left the RRC without permission and did not return." It also noted that "[e]scape from Federal custody is a continuing offense" and could be proven based on the defendant's "fail[ure] to report back to the facility in which he was confined."

Arredondo took the indictment and bill of particulars to mean that the government intended to prove he left without permission, not that he failed to return afterward. Based on that assumption, Arredondo believed he had a strong defense. He proceeded to trial, where security footage, testimony from a defense investigator and U.S. Marshals, and Chavarin's admissions on cross-examination corroborated Arredondo's testimony that she denied him entry.

During closing arguments, Arredondo's attorney stressed that the evidence strongly suggested Arredondo was denied entry on June 6. So in rebuttal, the government stressed Arredondo's failure to call or return to OceanView even though he knew he had time left on his federal sentence. This prompted the jury to ask whether the charge was "being considered today solely for June 6th" or for "every day after." In response, the district court instructed, "The offense of escape, as charged in the Indictment, is a continuing offense; which means that an escapee can be held liable for the knowing and willful failure to return to custody even after his

initial departure." The jury returned to deliberations, and thirty minutes later, they returned a guilty verdict.

Arredondo challenges his conviction, arguing that (1) the government's use of the continuing offense theory varied or amended the indictment, and (2) the district court's response to the jury note was misleading. As the dissent points out, the government's prosecution of the case raises concerns, but ultimately Arrendondo's arguments lack merit.

1. <u>There was no variance or amendment of the indictment</u>. Indictments set the outer bounds of conduct for which the defendant can be convicted. *See United States v. Miller*, 471 U.S. 130, 138 (1985). So if an indictment specifies that the defendant committed a particular offense in a particular time or place, he cannot be convicted based on evidence that he committed a different offense at a different time or place. *See United States v. Walker*, 575 F.2d 209, 214 (9th Cir. 1978). Arredondo argues that the indictment here specified that he escaped on June 6 or disobeyed an instruction to return. We disagree.

To start, indictments include all elements commonly understood in the definition of a charge, even if those elements are not expressly mentioned. *See United States v. Davis*, 336 F.3d 920, 923 (9th Cir. 2003). As the Supreme Court held in *United States v. Bailey*, "[g]iven the continuing threat to society posed by an escaped prisoner, 'the nature of the crime involved is such that Congress must

4

assuredly have intended that it be treated as a continuing one.'" 444 U.S. 394, 413 (1980) (citation omitted). Moreover, *Bailey* held an indictment that closely tracks the statutory language, as the indictment did here, suffices to charge a continuing offense even if not expressly stated in the indictment. *Id.* at 414. In other words, the failure to return is part of the escape offense, not a distinct crime, so it was included in the indictment even if not expressly referenced.[1]

Next, the indictment—especially read alongside the response to Arredondo's motion to dismiss the indictment—was broad enough to encompass Arredondo's failure to return, not just his initial escape. The indictment charged him with "willfully failing to remain within the extended limits of his confinement and willfully failing to report as directed to a federally contracted facility" on June 6. Instruction No. 10—to which Arredondo raised no relevant objection—reflected this by instructing jurors that "willfully failing to remain within the limits of his confinement" refers a willful failure "to return within the extended limits of his confinement" and not to a specific direction to report. And in the government's

---

[1] The dissent argues that, under *Bailey*, an escapee need only return if the conditions that caused him to leave have ended. **Dissent at 14.** That might be true if an escapee has, as in *Bailey*, asserted a duress defense to his initial escape—the defense's viability would then turn on the continuance of the conditions that supposedly compelled the escape. *United States v. Alvarez-Ulloa*, 784 F.2d 558, 568 (9th Cir. 2015). But Arredondo did not bring a duress defense, so his responsibility to return does not hinge on the conditions that caused him to leave. Nor does it hinge on the willfulness of his initial departure. *See United States v. Vowiell*, 869 F.3d 1264, 1269 (9th Cir. 1989).

response, the government cited *Bailey* and clarified that this meant Arredondo "left the RRC without permission and did not return." The bill of particulars also noted that "[e]scape from Federal custody is a continuing offense" and could be proven on a theory that a defendant "fail[ed] to report back to the facility in which he was confined." These broad statements fairly include the possibility the government would prove its case based on Arredondo's failure to return as well as his initial departure. There was thus no variance or amendment.[2]

2. <u>The district court did not mislead the jury</u>. Arredondo argues that the district court's response to the jury note was misleading because it implied that the indictment charged Arredondo with the continuing offense and omitted language that had been included in the indictment. Because the indictment fairly included the continuing offense, the district court did not err by suggesting that to the jury.

For these reasons, we **AFFIRM** the judgment of conviction.

---

[2] The dissent relies on *Lincoln v. Sunn* to conclude that, even if the indictment included the continuing offense, the government's belated decision to rely on that theory of guilt still constructively amended the indictment. **Dissent at 16.** In *Lincoln*, the prosecution mislabeled a murder offense as "murder for hire" but correctly listed the elements of murder. 807 F.2d 805, 812 (9th Cir. 1987). Because "murder" and "murder for hire" are different offenses, the panel remanded for the district court to consider whether the mislabeled indictment notified the defendant that he was being charged with murder. *Id.* at 813. Here, the indictment correctly charged Arredondo with "escape," not a different offense, and there was no material "deviation between the indictment and the jury instructions." *Id.* *Lincoln* is inapposite.

6

No. 22-50132, *United States v. Arredondo*

CLIFTON, Circuit Judge, dissenting:

While serving the last month of his federal sentence at a halfway house in San Diego, Reymundo Arredondo received permission to leave and go to the hospital. While waiting at the hospital, Arredondo was surprised to learn by a text from his bunkmate that the halfway house had placed him on escape status. He called the halfway house repeatedly to resolve the misunderstanding, but when his efforts failed, he immediately returned. What happened when he arrived is disputed. A halfway house employee, Yesenia Chavarin, claimed that she told Arredondo to come in, but he refused and escaped. Arredondo contended (and the evidence indicated) that Chavarin had prevented him from reentering. With little else to do, Arredondo left and went to his mother's house. For months, that's where he remained, until U.S. Marshals eventually arrested him on a hiking trail near his mom's residence.

*The Shawshank Redemption*, this case is not. But Arredondo was aggressively prosecuted by the U.S. Attorney's Office, even after it became clear that Chavarin, the prosecution's key witness, was unreliable. The facts established at trial further indicated that Arredondo had not committed the offense alleged in the indictment. He had not "escaped."

1

So, at the last moment, the prosecution changed horses, abandoning the theory that Arredondo had lied about being refused entry and instead arguing that *even if* he had been turned away, he was nonetheless guilty of the continuing offense of escape because he failed to return to the halfway house in the months that followed his departure. The prosecution had mentioned this theory exactly once in the lead-up to trial and had otherwise fled from it before and during trial – that is, until it appeared that the case against Arredondo was in serious jeopardy. Only during its closing arguments did the prosecution begin to champion the idea that Arredondo was guilty simply because he had never returned. The Government's change of theory at such a late stage did not permit Arredondo to adequately mount a defense, resulting in a prejudicial variance or constructive amendment of the indictment. Because I would reverse Arredondo's conviction, I respectfully dissent.

## I.     Facts

On June 6, 2021, Arredondo was serving the last month of a 54-month federal sentence at OceanView, a halfway house in San Diego. He awoke that morning with debilitating vertigo, a recurring problem, and requested permission to leave the halfway house and see a doctor. Permission was granted for Arredondo to travel from OceanView to a nearby hospital. Around noon, Arredondo was given

a bus pass and instructed to return to the halfway house by 4:00 p.m. or call to request additional leave time.

Arredondo's route to the hospital required him to travel by foot, trolley, and bus. Evidence submitted at trial indicated that the journey would typically take about an hour and 20 minutes. But on June 6, the Padres were hosting an afternoon baseball game in the area and a car show was ongoing nearby, delaying Arredondo and extending his travel time to one hour and 40 minutes. When he finally arrived, it took an additional hour for Arredondo to be checked into the emergency room.

Back at OceanView, shift supervisor Yesenia Chavarin was wondering where Arredondo was. According to Chavarin, Arredondo was supposed to have contacted OceanView as soon as he got to the hospital. Two hours after his departure, Chavarin hadn't heard from Arredondo, so she called her supervisor to inform her of the situation. The supervisor suggested that Arredondo was potentially in the waiting room, waiting to be admitted, but after the call, Chavarin placed Arredondo on escape status nonetheless. An escape packet was sent out for him at 2:13 p.m., and OceanView employees began packing up his things.

In fact, Arredondo *was* stuck in the waiting room at the time. But no attempt was made to contact Arredondo, whether to determine his location or to notify him that he was considered an escapee. Instead, he heard it through the grapevine, receiving a text message from a bunkmate informing him that the halfway house

had placed him on escape status. After corroborating the story with another bunkmate, Arredondo immediately called the halfway house. Then he called again, and again, a total of seven times. At some point, Arredondo was connected to Chavarin and tried to explain the misunderstanding. He attempted to prove that he was at the hospital by having medical staff speak to Chavarin, but Chavarin was not satisfied. She insisted that Arredondo had escaped and demanded that he return to the halfway house. Arredondo told hospital staff he needed to leave and called a friend for an immediate ride back to OceanView.

Arredondo arrived back at the halfway house around 3:25 p.m., well before his original 4:00 p.m. deadline. When he entered the lobby, Chavarin was there at the check-in window. The parties dispute what happened next. Chavarin claimed that Arredondo signed in, passed through the metal detector, and received a pat-down. An emotional conversation ensued, which according to Chavarin culminated with Arredondo storming out of the facility.

Arredondo's account was markedly different. According to Arredondo, he never passed through the metal detector or made it into the facility at all. Instead, he claimed, Chavarin insisted that he couldn't come in. For 25 minutes, Arredondo tried to convince Chavarin to let him back into OceanView – repeatedly explaining that he had been at the hospital, showing her his hospital bracelet, etc. – to no avail. Chavarin never budged: she told Arredondo that he had escaped from

4

custody, could not be there, and needed to leave. Eventually, he complied. He went to his mom's house in nearby La Mesa and remained there for the next four months. On October 21, 2021, long after his original custodial sentence had ended and over four months after the OceanView incident, U.S. Marshals arrested him on a trail near his mother's house.

Arredondo was charged with escape from federal custody. It wasn't the first time: Arredondo had been at OceanView on June 6 as part of his sentence for a prior escape from a federal halfway house, though under such markedly different circumstances that the court refused to allow evidence of the prior escape at trial. Between this history and Chavarin's account of Arredondo's departure from OceanView, the case must have looked like a slam dunk. But in the run-up to trial, the case would begin to unravel, forcing the Government to change course in its pursuit of a conviction.

The indictment charged Arredondo with violating 18 U.S.C. §§ 751(a) and 4082(a) by "willfully failing to remain within the extended limits of his confinement and willfully failing to report as directed to a federally contracted facility" on June 6. This language did little more than restate the statutory text, so Arredondo's attorney moved for a bill of particulars, asking whether the "specific factual scenario liability" was (1) Arredondo's absence from the facility when

initially placed on escape, (2) Arredondo's departure from the facility after he returned there at 3:25 p.m., or (3) both. He also moved to dismiss the indictment.

The Government obliged the request for a bill of particulars and explained: "Defendant is alleged to have committed the offense of escape from Federal custody when, upon returning to [OceanView] at approximately 3:25 PM on June 6, 2021, Defendant then left [OceanView] without permission and did not return." Later on in the same filing, the Government also responded to Arredondo's motion to dismiss, noting that "[e]scape from Federal custody is a continuing offense. [*United States v.*] *Bailey*, 444 U.S. [394,] 413 [(1980)]." This would be the last time the Government would refer to escape as a continuing offense until the very end of Arredondo's trial.

As the case proceeded to trial, the Government made its theory perfectly clear. It was going to prove that Arredondo had never been denied entry and walked out of OceanView on his own initiative. This was not a theory of escape as a continuing offense. In fact, when the district court hinted at such a theory, asking whether "this [was] a case where [Arredondo] got into some row and . . . left and then came back the next day and tried to get in," the Government declined to pick up the lead. Instead, addressing the disputed issue of whether Arredondo had been denied reentry, the Government laid out its theory of the case:

> "That's [where] the factual dispute lies. The United States is submitting when he returned to [OceanView], he was specifically told, no, we did place

6

you on escape status, but come in now. Sign in now. You can work out whatever the potential consequences may be with your B.O.P. officer, probation officer, whoever is assigned to you. It is the United States' contention, and we intend to prove at trial, he was absolutely never told you cannot come in. It's too late now."

The district court expressed bafflement at the Government's approach. "It's kind of surprising that this is going to trial," the court said. "I don't want to get out of my lane here, . . . but it's just curious the way these things are being handled. . . . It's not like he broke out windows or there was an armed takeover of guards and he escaped. He gets into some row. He has a point of view; they have a point of view. He walked away from a[] [halfway house]. . . . I don't really understand the charging prerogatives and priorities of your office. But, okay."

On the eve of trial, the continuing offense theory reemerged in the court's response to a defense motion to exclude evidence of Arredondo's arrest. The court denied the motion, reasoning that it was relevant to escape as a "[c]ontinuing offense, though, until they catch him. He's still on escape status as of the day they find him on the mountain trail." Even so, the prosecution maintained that "the Government's position is that – frankly, the key question at trial is really going to turn on what his intent was when he chose to walk away."

At trial, the Government continued to ignore the continuing offense approach and hinged its case on the theory that Arredondo had never been denied access to the facility. Accordingly, the evidence at trial focused on whether

Arredondo had "chose[n]" to leave OceanView "without permission," or had been forced to leave because he had been denied entry. Chavarin was called as the Government's first witness and testified that Arredondo had passed through the metal detector into the interior of the facility and been patted down before he walked out, despite her encouragement to stay.

On cross examination, however, Chavarin admitted that security footage showed her inside of the metal detector while Arredondo remained outside, supporting Arredondo's contention that he had never been permitted to reenter OceanView at all. Additionally, her account of her communications with Arredondo on June 6 was riddled with inconsistencies. Her initial report made no mention of any attempt to call Arredondo. But in a subsequent interview with U.S. Marshals, Chavarin stated that she had attempted to call Arredondo on his cell phone multiple times. When asked about this statement at trial, Chavarin stated that she could not recall making it and could not recall making the calls. Furthermore, Chavarin testified that she had told yet another story to defense investigators only a week prior to trial, when she claimed that Arredondo did not have his cell phone with him on June 6.

Other evidence further undermined Chavarin's account. Arredondo testified that he had his cell phone with him on June 6 and that OceanView had never called him, although he had called the facility several times. Phone records corroborated

8

Arredondo's story, showing that he had called OceanView seven times but that Chavarin had never called him. And testimony that OceanView staff had begun collecting Arredondo's belongings after he was placed on escape status, despite official policy requiring staff to let those on escape status back into the facility, further suggested that staff had no intention of allowing Arredondo to return.

After the close of evidence, the parties discussed proposed jury instructions with the court. The court acknowledged that the key to the case was Arredondo's testimony that he "didn't make a knowing decision to leave in violation of law[;] [he] was up against this impediment that Ms. Chavarin imposed." The finalized jury instructions did not touch on whether escape was considered a continuing offense.

During closing arguments, the Government repeatedly emphasized its theory of the case for the jury. "[U]ltimately, what the evidence boils down to in this case is the simple question of was the defendant denied entry to the halfway house when he returned at 3:25 in the afternoon? That's really what – what the core issue boils down to." According to the Government, the jury's task would be "to determine . . . which version of events of the conversation that happened between Ms. Chavarin and the defendant is true." Defense counsel responded in kind, agreeing that these were the key issues in the case but arguing for a verdict of acquittal. Then, during its rebuttal, the Government for the first time argued before

the jury: "Each day after June 6th the defendant makes the choice to not contact the authorities. . . . When he makes the choice not to return to the halfway house, all of those are important." The defense objected on variance grounds but was overruled.

The case was submitted to the jury, who deliberated for two-and-a-half hours before sending a note to the court asking whether "the charge of escape [is] being considered today *solely* for June 6th? Or is it for every day after, until the end of sentencing or apprehension?" The court interpreted this question as asking "whether [escape] is a continuing offense." Over the defense's objections, the court responded to the note by instructing the jury that "[t]he offense of escape, as charged in the Indictment, is a continuing offense; which means that an escapee can be held liable for the knowing and willful failure to return to custody even after his initial departure." 30 minutes later, the jury returned with a guilty verdict.

At sentencing, the Government requested a 27-month custodial sentence. Incredibly, it also moved for a two-point enhancement to the guidelines recommendation, arguing that Arredondo had obstructed justice by testifying falsely about his interaction with Chavarin. The court declined to impose the enhancement, reasoning that the jury's note suggested jurors "thought there was some doubt about, you know, whether the escape could be predicated on the date charged." As the court saw it, the conviction was predicated on the continuing offense instruction, with the court noting that "I don't think the jury was prepared

10

to convict him if I had instructed them otherwise, if I had said, 'No. No. You have – let's focus on this date that it was charged . . .'."

The court sentenced Arredondo to probation for five years. This appeal followed.

## II. Discussion

Arredondo argues that "the Government's argument and evidence deviated from the acts charged in the indictment," resulting in a constructive amendment. The indictment charged Arredondo with "willfully failing to remain within the extended limits of his confinement and willfully failing to report as directed to a federally contracted facility." It appears clear at this point that Arredondo's actions prior to the incident with Chavarin did not commit the criminal violation alleged in the indictment. Arredondo had permission to leave OceanView and go to the hospital, so he did not fail to remain within the limits of his confinement by doing just that. And when Chavarin ordered him back to OceanView, Arredondo obeyed and promptly returned. At that point, any purported escape was over. For Arredondo to be guilty of escape, then, he must have escaped anew after returning to OceanView as directed. The majority disposition, though it responds to this dissent, at 5 n. 1 & at 6 n. 2, does not contest this assessment, limiting its response to legal propositions that will be discussed below.

The continuing offense is said to have begun when Arredondo walked out of OceanView after his confrontation with Chavarin. For every day that he did not return, he persisted in his escape. But in order for there to have been a "continuing offense," there must have been an "offense" in the first place. Arredondo cannot have "willfully fail[ed] to remain within the extended limits of his confinement" if he was ordered to leave. And since no one sought him out or directed him to return thereafter, he did not "willfully fail[] to report *as directed*" (emphasis added) to OceanView. His conviction on this basis did not match the charge laid out in the indictment and thus amounts to a constructive amendment.

The majority relies on *United States v. Bailey*, 444 U.S. 394 (1980), to support the opposite conclusion. In *Bailey*, four men imprisoned in a District of Columbia jail "crawled through a window from which a bar had been removed, slid down a knotted bedsheet, and escaped from custody." *Id.* at 396. Defendants did not deny that they had "escaped." They argued that their escape had been a matter of duress or necessity: the conditions in the jail were so atrocious that they had no choice but to flee. Based on this affirmative defense, the case at trial hinged on whether (1) the charge of escape applied only to the initial flight, or to the prisoners' continued absence from the jail as well, and whether (2) the prisoners' failure to "turn[] themselves in after they had escaped the allegedly coercive conditions" was fatal to their duress or necessity defense. *Id.* at 398-402.

As to the first question, the Supreme Court held that it was "clear beyond peradventure that escape from federal custody as defined in § 751(a) is a continuing offense and that an escapee can be held liable for failure to return to custody as well as for his initial departure." *Id.* at 413. Accordingly, "no significant 'variance'" from the indictment results merely because the defendant is not "indicted under a theory of escape as a continuing offense." *Id.* at 414. As to the second question, the Court concluded that in order to support a duress defense, a prisoner "must first offer evidence justifying his continued absence from custody as well as his initial departure[,] and . . . an indispensable element of such an offer is testimony of a bona fide effort to surrender or return to custody as soon as the claimed duress or necessity had lost its coercive force." *Id.* at 412-13.

According to the Government, *Bailey* is applicable here because "[l]ike the defendants in *Bailey*, Arredondo alleged that he had an excuse for his initial departure." Thus, "whether the initial departure was justified, . . . Arredondo could be held responsible for [the continuing offense of] fail[ing] to return to custody," again like the defendants in *Bailey*. But this argument misses the other key point from *Bailey*. The defendants in that case had "escaped," having left without authorization. Escape in such circumstances becomes a continuing offense "once [a defendant] ha[s] freed [himself] from the conditions" precipitating the escape. *Id.* at 399. Put another way, once the justification for the absence from custody has

13

been removed, the excuse for that absence becomes invalid and an escapee must take affirmative steps to turn himself in. Once the prisoners had reached safety and were no longer at risk from the dangerous conditions in the jail, they were obligated to return themselves to custody. *Id.* at 415.

The key distinction between *Bailey* and our case is that unlike the prisoners in *Bailey*, Arredondo never left the facility on his own. He never committed the *continuing* offense of escape because he had not escaped in the first place. Arredondo did not leave custody because of a perceived problem with the conditions of his confinement, as was the case in *Bailey*. He did so because a person with authority vested by the Attorney General denied him reentry into confinement, told him he "could not be there," and ordered him to leave.

At no point thereafter did anything occur to lessen or remove the coercive force of that directive. No one sought Arredondo out or directed him to return to OceanView, as they had done earlier in the day on June 6. If someone with authority had directed him to return, he could properly have been held to have violated the statute by failing to follow the direction, but that did not happen. No evidence was offered that he was directed to report to the facility.

To be sure, Arredondo might have taken affirmative steps to talk his way back into custody, but it would be unfair and unrealistic to impose criminal liability based on his failure to do so. He had already tried that once, to no avail, and had no

14

reason to believe that some other official would see things differently and allow him to return. As far as he knew, the coercive conditions precipitating his absence remained the same – he was not allowed to be at OceanView. Short of breaking back into the facility, it's hard to see what else Arredondo could have done.

If Arredondo was never permitted or directed to return, he cannot be guilty of "willfully failing to report as directed to a federally contracted facility" after his departure on June 6. Nor can he be guilty of "willfully failing to remain within the extended limits of his confinement," as his failure to remain at OceanView was caused by Chavarin's denial of entry and was not willful. The conduct for which Arredondo was convicted does not appear to be criminal under 18 U.S.C. §§ 751(a) and 4082(a). His conduct did not fit the charge leveled in the indictment. The result is a constructive amendment.

The majority, above at 5 n. 1, argues that Arredondo's "responsibility to return [did] not hinge on the conditions that caused him to leave" because he did not assert duress as the reason that he left. But the majority fails to identify what direction he ever failed to follow or how he willfully failed to remain within the extended limits of his confinement. The majority states, at 5: "The indictment charged him with 'willfully failing to remain within the extended limits of his confinement and willfully failing to report as directed to a federally contracted facility' on June 6." Arredondo left the first time with permission to go to the

15

hospital. He left the second time because he was turned away. The majority does not dispute those fact but nonetheless maintains that he "escaped" in violation of the statute. How?[1]

Even if the indictment had included the offense charged, the Government's late change in theory provides another reason to find Arredondo's conviction invalid. According to the majority, at 6, the "broad statements" in the indictment and bill of particulars "fairly include[d] the possibility the government would

---

[1] The legal argument offered by the majority in response, at 5 n. 1, misses the point. Contrary to the majority's indication, *Bailey* held only that evidence justifying continued absence is necessary for showing duress, not that raising a duress defense is necessary for being able to rely on such evidence. *See Bailey*, 444 U.S. at 412 ("[I]n order to be entitled to an instruction on duress or necessity…an escapee must first offer evidence justifying his continued absence from custody…."); *see also United States v. Alvarez-Ulloa*, 784 F.3d 558, 568 (9th Cir. 2015).

Arredondo did not bring a duress defense here. That does not mean, however, that the circumstances surrounding his alleged "escape" cease to be relevant. Arredondo did not leave because of poor conditions in the facility, as in *Bailey*. He was locked out. In contrast, the other prisoners in *United States v. Vowiell*, 869 F.2d 1264, 1265 (9th Cir. 1989), "cut through a fence and escaped." That there had been an "escape" to begin with was not disputed. The issue in that appeal was admission of evidence, not "the willfulness of his initial departure," as the majority suggests.

On the specific page from *Vowiell* cited by the majority, *id.* at 1269, we observed that there is no separate crime for a prisoner not turning himself in after escaping. We cited *Bailey* for the proposition that "an escapee can be held liable for not returning to custody" because "that conduct is included within the crime of escape." But the premise of that statement was that the prisoner escaped in the first place. Arredondo did not. He left with permission and was turned away when he tried to return. Failing to return is not a separate crime.

prove its case based on Arredondo's failure to return as well as his initial departure," resulting in no variance or amendment. But when the Government exclusively pursues one theory and then abandons it at the last minute for another, an amendment or variance may result *even though* the indictment included the alternate theory. *See Lincoln v. Sunn*, 807 F.2d 805, 812-14 (9th Cir. 1987).

Our decision in *Lincoln v. Sunn* is instructive. There, defendant Lincoln challenged his murder conviction on the basis that his indictment failed to provide notice of the Government's theory of guilt and thus prevented him from preparing an adequate defense. *Id.* at 812. The indictment charged Lincoln with "murder for hire," an offense requiring proof of a contract. *Id.* But at trial, the jury was instructed that it could convict on a theory of accomplice liability, irrespective of any contractual relationship. On appeal, we concluded that despite this discrepancy, the indictment "explicitly alleged the elements of murder, . . . the means by which the murders occurred, [and] provided correct statutory citations to the offenses." *Id.* at 813. Thus, we assumed the indictment fairly included both theories and provided adequate notice that Lincoln would have to defend against the accomplice liability theory upon which he was ultimately convicted.

But "resolution of [that] question [did] not end the inquiry." *Id.* We observed that "Lincoln's argument [was] that it was unfair to charge murder, clearly giving notice of the prosecution's theory that there was a murder contract, and then to

place before the jury instructions regarding an alternative theory." *Id.* "[B]ased on the indictment, he plotted his defense strategy on the assumption that if he could generate reasonable doubts in the minds of the jury concerning the existence of a contract, he would prevail." *Id.* Although we reserved ruling and remanded the issue to the district court, we proceeded to note that "[a] change in the government's theory late in the case might constitute prejudicial variance, or a constructive amendment. A critical consideration is whether the introduction of the new theory changes the offense charged, or so alters the case that the defendant has not had a fair opportunity to defend." *Id.* (citations omitted). [2]

The case before us is highly analogous to *Lincoln*. The indictment against Arredondo included all the elements required for the continuing offense of escape, accurate statutory citations, and (as supplemented by the bill of particulars) a description of the means of commission. This may have been enough to "fairly include the possibility" that the Government would convict Arredondo under a continuing offense theory, but that determination does not end our inquiry. We

---

[2] The attempt by the majority to distinguish *Lincoln* is also off the mark. I don't dispute that the indictment in our case charged Arredondo with "escape." That does not end the inquiry. What we held in *Lincoln* was that a change in theory during trial – as happened here – could deprive the defendant of a fair opportunity to defend. In this case, it did.

must also ask whether the Government, in waiting until the last moment to embrace that theory, deprived Arredondo of a fair opportunity to defend against it.

The answer here is clearly "yes." The indictment itself, the prosecution's pretrial conduct, and the Government's evidence at trial, opening statement, and initial closing statement, all point to a single theory of the case: Arredondo was guilty of escape because he had *willingly* refused to return to OceanView after being instructed to do so. Consequently, Arredondo, like Lincoln, "plotted his defense strategy on the assumption that if he could generate reasonable doubts in the mind of the jury" about whether Ms. Chavarin had invited him back into OceanView, "he would prevail." *Id.* at 813. When it appeared that Arredondo was succeeding in cultivating such doubts among the jury, the Government abruptly changed tack and began pressing its theory of escape as a continuing offense. At that point, it was too late for Arredondo to mount a defense.

The Government's entire approach to the prosecution affirmatively misled Arredondo into believing that the case hinged on the Government's ability to prove that he had been allowed back into OceanView and refused. In the Government's own words, "That's [where] the factual dispute lies. . . . It is the United States' contention, and we intend to prove at trial, that he was absolutely never told you cannot come in." Even if the indictment fairly included both theories of guilt, the prosecution's late change in theory so altered the case as to prejudice Arredondo's

ability to present an adequate defense. Following the lead of *Lincoln*, we should conclude that the Government's conduct resulted in a constructive amendment or prejudicial variance.[3]

I have serious misgivings about whether this case should ever have been pursued by the Government after the facts of what actually happened became clear and the testimony of its main witness, Chavarin, lost credibility. The Government's goal is supposed to be justice, not obtaining a conviction in circumstances where it is far from clear that the defendant actually did anything "wrong." Regardless of my personal views, the case was tainted by errors which resulted in a constructive amendment of or prejudicial variance from the indictment against Arredondo. For the foregoing reasons, I would reverse.

---

[3] This conclusion is supported by decisions of other circuits. *See, e.g., United States v. Doucet*, 994 F.2d 169, 172 (5th Cir. 1993) ("[T]he government's change in position during the trial can be sufficient to work a constructive amendment of the indictment *even where the court does not formally alter the elements of the offense in the jury charge*." (discussing *United States v. Beard*, 436 F.2d 1084 (5th Cir. 1971)).